SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Walter WENCKE, et al., Defendants.

Theodore deLUSIGNAN,
Movant-Appellant,

v.

R.N. GOULD,
Receiver-Trustee, Appellee.

No. 83–6469.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 4, 1984.

Decided Feb. 19, 1986.

Procopio, Cory, Hargreaves & Savitch, Michael J. Radford, San Diego, Cal., for movant-appellant.

Michael S. Polan, Michael G. Zybala, Law Firm of Alex A. Harper, San Diego, Cal., for appellee.

Before WALLACE, FLETCHER and REINHARDT, Circuit Judges.

FLETCHER, Circuit Judge:

Theodore deLusignan appeals from a post-judgment order by the district court requiring Ramapo Corporation ("Ramapo"), in which he is a 25% stockholder, to disgorge 401,351 shares of Portsmouth Square, Inc. ("PSI") and the profits it derived from those shares. The district court issued its order following judgment in a securities fraud action brought by the Securities and Exchange Commission (SEC) against Walter Wencke, who had diverted

funds from several public companies and funneled them through Ramapo to acquire the PSI shares. DeLusignan contends that in entering its disgorgement order, the district court exceeded its jurisdiction, violated the Federal Rules of Civil Procedure, and deprived both him and Ramapo of due process. We find these claims to be without merit, and affirm.

### FACTUAL BACKGROUND

#### A. DeLusignan's Acquisition of His Ramapo Stock

PSI was incorporated in 1967 as a vehicle for investors to purchase a substantial interest in Justice Investors, a partnership that owned the Holiday Inn at 750 Kearny Street in San Francisco. In 1972, PSI was experiencing severe financial problems. All of its subsidiaries were losing money, and PSI was on the verge of bankruptcy. In May, 1972, deLusignan, president of PSI, responded to Walter Wencke's advertisement in the Wall Street Journal offering assistance to financially distressed companies.

Wencke proposed a financial aid arrangement to deLusignan and PSI's board of directors, under which Ramapo, a Delaware corporation created by Wencke and entirely owned by the Hansa Trust, a Wencke-family trust, would give PSI $10,000 in cash, assume $338,193 of PSI's liabilities, and provide assistance to PSI in negotiations to extend a $1.2 million obligation for which PSI was in default. In return, PSI would issue Ramapo its remaining authorized and unissued stock, which amounted to 401,351 shares, or a 53.5% controlling interest in the corporation. Wencke also offered to employ deLusignan as an officer of Ramapo, PSI, or one of their subsidiaries, and to transfer 25 of Ramapo's 100 shares to deLusignan. The PSI board ratified the terms of the stock transfer to Ramapo, and approved deLusignan's proposed employment contract and the transfer to him of the 25 Ramapo shares.

Shortly thereafter, Wencke and the other Ramapo shareholder, Paul Potter,[1] approved an employment contract on behalf of Ramapo with deLusignan, and the Hansa Trust made a "gift" to deLusignan of 25 Ramapo shares "in order that [he] would feel part of the [Ramapo] Company." DeLusignan served as president of PSI for the next five years, until 1977.

PSI's transaction with Ramapo enabled PSI to divest itself of unprofitable subsidiaries and to improve its net worth from a negative $323,121 to a positive $25,072. PSI is currently a prosperous, dividend-paying corporation with its shares valued at $6 to $7. DeLusignan contends that PSI's recovery was due in large part to his performance as president. He maintains that by 1977, PSI's hotel property was worth over $50 million, and that prior to the district court's disgorgement order from which he appeals, his Ramapo shares were worth about $2.6 million.

#### B. The Underlying Securities Fraud Action Against Wencke

In 1976, the SEC brought the underlying securities fraud action against Wencke, his wife, three other individuals, and twenty-five trust and corporate defendants controlled by Wencke and his associates. See *SEC v. Wencke*, 622 F.2d 1363, 1366 (9th Cir.1980). Wencke was alleged to have violated state and federal law and breached his fiduciary duties by diverting assets and monies from companies and entities he controlled, including Time-Lenders, Inc. ("Time"), Sun Fruit, Ltd. ("Sun Fruit"), Santa Fe Financial Corporation ("Santa Fe"), and their subsidiaries, and using these funds for his personal benefit and profit. DeLusignan, Ramapo, and the Hansa Trust were not parties in the underlying action.

In March, 1977, the district court entered its final judgment. It permanently enjoined Wencke and the other defendants

---

**1.** Potter, who was a named defendant in the underlying securities fraud action against Wencke, held 15 shares in Ramapo.

from further securities activity and ordered Wencke to disgorge all assets or monies that he had taken directly or indirectly. The court appointed R.N. Gould as receiver of Time, Sun Fruit, and Santa Fe. Gould was authorized to assume possession and control over all these companies' assets, to operate them on an ongoing basis, to hire attorneys and accountants to audit and investigate their financial condition and transactions, to resist all actions and claims brought against them, to prosecute all claims they had, and to manage and conserve their assets for the benefit of their defrauded investors until the extent of the receivership estate could be determined. *See id.* at 1366–67.

In November, 1977, the district court specifically appointed the Receiver as voting trustee of the 60 shares of Ramapo owned by Wencke or the Hansa Trust.[2] In March, 1979, the court entered an order directing the Receiver and his counsel to identify and trace all assets and monies that Wencke and those in concert with him had looted from Time, Sun Fruit, Santa Fe, or their subsidiaries, as well as ill-gotten gains derived from those assets, and to initiate disgorgement proceedings to recover those assets and ill-gotten gains. The Receiver has brought six applications for disgorgement.

## C.   The   Disgorgement   Proceedings Against DeLusignan and Ramapo

In November, 1980, the Receiver filed two virtually identical pleadings in the district court. First, he filed his Application Number 4 in Disgorgement as a post-judgment pleading in the securities fraud action against Wencke. It was directed at deLusignan, Ramapo, Wencke, the Hansa Trust, and several other individuals and entities, and sought disgorgement of Ramapo's corporate charter, the 60 Ramapo shares held by the Hansa Trust, and the 25 shares held by deLusignan. Second, the Receiver filed a complaint initiating a completely separate and independent action against deLusignan, Ramapo, and the Hansa Trust seeking disgorgement of Ramapo's corporate charter and certificates and a declaration imposing a constructive trust over the three defendants' Ramapo holdings. The Receiver amended this complaint in 1982 and deleted Ramapo as a defendant, but the amended complaint still sought disgorgement of deLusignan's 25 Ramapo shares.

The Receiver's disgorgement application was served on Ramapo and the Hansa Trust in January, 1981, and on deLusignan in April, 1981. No summonses were served with the disgorgement application. In November, 1983, deLusignan was served with a summons and the complaint in the separate action filed by the Receiver in 1980.

Following service of the Receiver's disgorgement application upon deLusignan, two years and four months passed without any action being taken on the application. However, deLusignan was deposed in connection with his dealings with Wencke in April, 1981 and again in June, 1981. On August 19, 1983, deLusignan was served with another copy of the disgorgement application, a set of supporting documents, and a notice of a hearing to be held on the application before the magistrate/special master nineteen days later.

On September 2, 1983, deLusignan filed an objection to the scheduled hearing, claiming that the district court lacked personal jurisdiction over him, and that permitting the Receiver to proceed against him with the disgorgement application would violate his due process rights. The magistrate/special master conducted an evidentiary hearing on the disgorgement application, at which deLusignan's counsel made only a "special appearance" and did not present evidence or question witnesses.[3]

---

**2.** By early 1979, Paul Potter had quitclaimed his 15 shares of Ramapo to the Receiver as part of a compromise, leaving the Receiver with 75 Ramapo shares. DeLusignan held the other 25.

**3.** We cannot understand why DeLusignan's counsel made a "special appearance" to raise his

client's jurisdictional and procedural objections before both the magistrate/special master and the district court. Federal Rule of Civil Procedure 12 abolished the distinction between general and special appearances when the Federal Rules were adopted in 1938. *See, e.g., Republic International Corp. v. Amco Engineers, Inc.,* 516

The evidence indicated that Wencke had diverted at least $89,000 from Time, Santa Fe, and their subsidiaries, and had advanced these funds to Ramapo to acquire a majority interest in PSI and to provide operating funds for PSI. At the conclusion of the hearing, the magistrate indicated that he was prepared to find that Ramapo's assets, specifically its PSI shares and the profits it had derived from them, constituted "ill-gotten gains and as such are subject to disgorgement."

Counsel for the Receiver was directed to prepare findings of fact, conclusions of law, and recommendations. The magistrate adopted these findings and recommendations as drafted, and lodged them with the district court on October 7, 1983. The magistrate recommended that Ramapo be deemed a constructive trustee for the benefit of Time's and Santa Fe's defrauded shareholders, and that it be required to disgorge its PSI shares and the profits it

had derived from them. Under the magistrate's recommendations, deLusignan was not required to relinquish any of his Ramapo shares, although Ramapo's disgorgement of its PSI holdings and accrued profits made those shares virtually worthless.[4]

On the same day, the Receiver moved the district court for adoption of the magistrate's findings, conclusions, and recommendations. On October 17, 1983, deLusignan filed a notice of special appearance in the district court and filed objections to the magistrate's findings and recommendations. He objected on the grounds that the court lacked jurisdiction over him and that the conduct of the disgorgement proceedings violated the Federal Rules of Civil Procedure and due process.[5] DeLusignan did not object to any of the specific findings of fact or conclusions of law made by the magistrate.

On October 24, 1983, the district court held a hearing on the Receiver's motion to

F.2d 161, 165 (9th Cir.1975) ("Special appearances to challenge jurisdiction are no longer required in federal courts."); *Hays v. United Fireworks Manufacturing Co.,* 420 F.2d 836, 844 n. 10 (9th Cir.1969) (same); *Dragor Shipping Corp. v. Union Tank Car Co.,* 378 F.2d 241, 243 n. 2 (9th Cir.1967); *Martens v. Winder,* 341 F.2d 197, 200 (9th Cir.) ("Rule 12 ... eliminat[es] the distinction between general and special appearances."), *cert. denied,* 382 U.S. 937, 86 S.Ct. 391, 15 L.Ed.2d 349 (1965); 5 Wright and Miller, *Federal Practice and Procedure* § 1344, at 522 (1969) ("[T]echnical distinctions between general and special appearances have been abolished and no end is accomplished by retaining the terms in federal practice."). Thus, deLusignan's counsel could have presented evidence, questioned witnesses, or raised arguments on the merits of the disgorgement proceeding without sacrificing his client's right to challenge the court's jurisdiction.

4. DeLusignan now contends that this decision by the magistrate to order disgorgement *by Ramapo of its PSI holdings,* rather than disgorgement *by deLusignan and the Hansa Trust of their Ramapo shares* represented a "dramatic[ ]" shift in the nature of the disgorgement proceedings, and therefore unjustly "surprised" him and Ramapo. However, the Receiver's original disgorgement application listed Ramapo along with deLusignan and the Hansa Trust as "parties subject to disgorgement." Moreover, deLusignan never raised this claim at the district court, and never sought a continuance so that

he could respond to this change in the Receiver's disgorgement strategy during the seventeen days between the issuance of the magistrate's findings, conclusions, and recommendations, and the district court's October 24, 1983 hearing on the Receiver's motion to adopt those recommendations.

5. The Receiver contends that even if the district court did not have *personal* jurisdiction over deLusignan, it had *in rem* jurisdiction over Ramapo and its PSI shares, which entitled it to order Ramapo to disgorge those shares. Yet the district court made no specific finding that Ramapo's PSI shares were physically located within California, which would have been required for it to exercise *in rem* jurisdiction over those shares. *See* 4 Wright and Miller, *Federal Practice and Procedure* § 1071, at 273–74 (1969). Moreover, although the district court had acquired jurisdiction over all Wencke's assets in order to satisfy the claims against him, at the time of the district court's judgment, Wencke owned only 75 of Ramapo's 100 shares. Ramapo and deLusignan were not parties to the securities fraud action against Wencke, and therefore, deLusignan's 25 Ramapo shares and the Ramapo corporation itself were not already within the district court's jurisdiction at the time the Receiver filed his disgorgement application. We need not decide the precise extent of the district court's *in rem* jurisdiction, however, in light of our conclusion that the district court had personal jurisdiction over both Ramapo and deLusignan. *See* Section B, *infra.*

adopt the magistrate's recommendations and on deLusignan's objections to those recommendations. On November 7, 1983, the court rejected deLusignan's claims, adopted the magistrate's findings, conclusions, and recommendations, and ordered Ramapo to disgorge its PSI holdings and the profits it had acquired from PSI. It is from this order that deLusignan appeals.

## ANALYSIS

Since the district court did not order deLusignan to disgorge his Ramapo shares or any other property, but only ordered Ramapo to disgorge its PSI shares and profits, deLusignan's claims are based entirely upon the decrease in the value of his Ramapo shares resulting from Ramapo's disgorgement. As a result, the challenges deLusignan raises to the district court's disgorgement order and proceedings are essentially challenges on behalf of Ramapo as well as himself.

DeLusignan contends that the district court improperly employed summary, rather than plenary, proceedings when it determined that Ramapo was required to disgorge its PSI holdings, and that in the process, the district court exceeded its jurisdiction, violated the Federal Rules of Civil Procedure, and denied him and Ramapo due process. DeLusignan also maintains that the district court provided him and Ramapo with inadequate preparation time to respond to the Receiver's disgorgement application and to the magistrate's recommendation that Ramapo's PSI holdings, rather than the shares of Ramapo held by deLusignan and the Receiver, be disgorged. We find these claims to be without merit.

### A. DeLusignan's Standing to Appeal

Before addressing the merits of deLusignan's claims, we must first determine whether he has standing to bring this appeal. The Receiver contends that deLusignan lacks standing to challenge the district court's disgorgement order, because the order was directed at Ramapo, and deLusignan never formally moved to intervene as a party in district court. We do not agree.

Although persons who were not parties of record before the district court usually may not appeal that court's orders or judgment, we have allowed such persons to bring appeals in cases where: (1) they participated in the district court proceedings, and (2) the equities weigh in favor of hearing the appeal. *In re Proceedings Before Federal Grand Jury (Conforte)*, 643 F.2d 641, 643 (9th Cir.1981). We have specifically authorized nonparty creditors to appeal a district court's post-judgment order regarding an SEC-initiated receivership, where, as in the present case, they did not formally seek to intervene in the trial court, but nevertheless participated in the district court's proceedings and had "a legitimate interest" in the outcome of the appeal. *SEC v. Lincoln Thrift Association*, 577 F.2d 600, 602–03 (9th Cir.1978) (citing *West v. Radio-Keith-Orpheum Corp.*, 70 F.2d 621, 623–24 (2d Cir.1934)); *see SEC v. An-Car Oil Co.*, 604 F.2d 114, 119 & n. 4 (1st Cir.1979). Moreover, other courts have indicated that the equities supporting a nonparty's right to appeal an order relating to a receivership are especially significant where the receiver has haled the nonparty into the proceeding against his will, and then has attempted to thwart the nonparty's right to appeal by arguing that he lacks standing. *See West*, 70 F.2d at 623–24, *quoted in Lincoln Thrift*, 577 F.2d at 603; *An-Car Oil Co.*, 604 F.2d at 119 n. 4; *see also In re Proceedings*, 643 F.2d at 643 n. 2.

In the present case, it is undisputed that deLusignan participated in the district court's proceedings. The Receiver haled deLusignan and Ramapo into district court despite deLusignan's objections. DeLusignan made a special appearance and raised all the jurisdictional, procedural, and due process claims that he is now raising on appeal. Throughout its proceedings, the district court treated deLusignan as if he were a party, accepting his briefs, asking him questions at hearings, and offering him the opportunity to cross-examine wit-

nesses—even after the object of the disgorgement proceeding changed from deLusignan's Ramapo shares to Ramapo's PSI holdings. Because it was clear at the time that the value of deLusignan's Ramapo holdings would be substantially diminished by Ramapo's disgorgement of its PSI stock, and because Ramapo did not adequately represent deLusignan's interest in the district court's proceedings, deLusignan would have been entitled to intervene in those proceedings as of right under Federal Rule 24(a). *See* Fed.R.Civ.P. 24(a)(2);[6] *see also County of Fresno v. Andrus,* 622 F.2d 436, 438 (9th Cir.1980). The fact that the district court allowed and encouraged deLusignan to participate fully in its proceedings even after he was no longer a target of disgorgement suggests that it perceived him as an intervenor.[7] For all these reasons, we conclude that deLusignan "participated" in the district court's disgorgement proceedings directed at Ramapo.

Moreover, we conclude that the equities weigh in favor of hearing deLusignan's appeal. The Receiver chose to hale deLusignan and Ramapo into the district court, and should therefore not be permitted to thwart deLusignan's appeal based on lack of standing, especially when deLusignan could have qualified to intervene as of right under Rule 24(a) had he formally applied. *See An-Car Oil Co.,* 604 F.2d at 119 n. 4. Since the target of disgorgement changed near the end of the disgorgement proceedings, there may have been confusion as to who were the parties of record. Furthermore, the disgorgement proceed-

ings were summary in nature, and the district court did not require the parties to file formal complaints or answers, or to serve summonses. *See SEC v. Universal Financial,* 760 F.2d 1034, 1037 (9th Cir.1985) (per curiam). Thus, it would have been reasonable for deLusignan to believe that he did not need to file a formal motion to intervene. The Receiver and other parties were aware of deLusignan's participation and had a full opportunity to respond to his arguments in the district court proceedings, and to develop any record necessary to respond to those arguments. As a result, it would be both inconsistent and inequitable for this court to refuse to hear deLusignan's appeal based simply upon his failure to file a formal motion to intervene. It would have been better had deLusignan moved to intervene. *In re Proceedings,* 643 F.2d at 643; *Lincoln Thrift,* 577 F.2d at 603. Nevertheless, because deLusignan participated in the district court's disgorgement proceedings, and because the equities weigh in favor of hearing his appeal, we conclude that deLusignan has standing to bring his appeal.

### B. DeLusignan's Challenges to the Disgorgement Proceedings

DeLusignan raises two sets of challenges to the district court's disgorgement order and proceedings. First, he challenges the district court's employment of summary, post-judgment proceedings when it ordered disgorgement of Ramapo's PSI holdings, rather than requiring the Receiver to pursue the separate, plenary action the Receiv-

---

**6.** We conclude that the disgorgement of Ramapo's PSI shares would "as a practical matter impair ... [deLusignan's] ability to protect [his] interest" in the value of his Ramapo shares. Fed.R.Civ.P. 24(a)(2) (emphasis added). This is not inconsistent with our conclusion, *see infra,* that deLusignan may still be entitled to recover damages for the lost value of his Ramapo shares or for the value of his services to Ramapo and PSI. It merely reflects that deLusignan will be required to pursue litigation to recover the lost value of his Ramapo holdings, and that he may not succeed in that litigation.

**7.** At least two circuit courts have held that if trial courts treat potential intervenors essential-

ly as parties during proceedings, they should be treated as intervenors at the appellate level as well, even if they have not complied with the formal requirements of Rule 24. *See International Marine Towing, Inc. v. Southern Leasing Partners, Ltd.,* 722 F.2d 126, 128–29 (5th Cir. 1983), *cert. denied,* — U.S. ——, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984); *In re Beef Industry Antitrust Litigation,* 589 F.2d 786, 789 (5th Cir.1979); *Roach v. Churchman,* 457 F.2d 1101, 1104 (8th Cir.1972); *see also Lincoln Thrift,* 577 F.2d at 603. Because we conclude that deLusignan has satisfied the two requirements to bring an appeal delineated in *In re Proceedings,* we need not make such a ruling in the present case.

er had initiated against deLusignan, Ramapo, and the Hansa Trust in 1980. Second, deLusignan contends that the district court's disgorgement proceedings violated due process, because he and Ramapo were required to respond to the Receiver's disgorgement application within only nineteen days, and because the nature of the disgorgement sought by the Receiver was altered at the last minute.

### 1. Challenge to the Use of Summary Proceedings

DeLusignan maintains that if the Receiver wanted to seek disgorgement of Ramapo's PSI holdings, he should have been required to pursue the independent action he filed in 1980, and should not have been permitted to circumvent the requirements of civil procedure and due process by seeking disgorgement in summary post-judgment proceedings. DeLusignan contends that: (1) the district court lacked jurisdiction to enter its disgorgement order against him and Ramapo, since neither of them had been a party to the underlying securities fraud action against Wencke or was bound by the default judgment in that action; (2) the disgorgement proceedings violated the Federal Rules of Civil Procedure, since they were conducted without the filing of a formal complaint or answers, and since the disgorgement application was served on deLusignan and Ramapo without summonses; and (3) the disgorgement proceedings violated due process, since they were summary in nature and did not provide full-scale procedural protections.

We cannot accept deLusignan's contentions. We rejected like claims either implicitly or explicitly in a recent case, *SEC v. Universal Financial,* 760 F.2d at 1034. *Universal Financial* arose out of a securities fraud action brought by the SEC against a mortgage loan broker who had misrepresented to various investors the nature of the security interests he sold them;

the district court appointed a receiver to manage the broker's assets for the benefit of his investors. *Id.* at 1036. The receiver attempted to categorize the various investors' ownership interests in the promissory notes and deeds of trust held in the receivership, and the district court ruled that the extent of these ownership interests could be determined in trials pursuant to its summary jurisdiction. *Id.* at 1036–37. A set of investors, who had not been parties to the underlying securities fraud action, challenged the district court's jurisdiction to adjudicate their claims in summary proceedings, contending that "summary jurisdiction is unconstitutional where an adverse claimant presents a substantial claim that he, rather than a receiver ... is the owner of [a property interest or right held within a receivership]." [8] *Id.*

We rejected the investors' contention that district courts are flatly prohibited from adjudicating in summary post-judgment proceedings the claims of nonparties to property claimed by securities receivers. *See id.* We indicated that to determine the adequacy of a summary proceeding in a given case, courts must focus not on the *form* of the proceedings, but on their *substance:* in *Universal Financial,* for example, "the distinction between summary and plenary proceedings was of no consequence ... because the district court afforded [the nonparties challenging its jurisdiction] virtually all of the procedural protections which would have been available in plenary proceedings." *Id.* (citation omitted); *see In re Reading Co.,* 711 F.2d 509, 516–17 (3d Cir.1983) (citation omitted). We did not accept the contention that the lack of a formal complaint and answer prevented the district court from exercising its jurisdiction and resolving the dispute, because the parties challenging jurisdiction had notice concerning the nature of the proceedings, were permitted extensive discovery, including the taking of depositions, and were

---

**8.** In *Universal Financial,* the district court had conducted two "test cases" in which various investors had litigated their ownership interests to promissory notes held by the receiver, and had held that the investors in both cases had

valid ownership interests in the notes. *See* 760 F.2d at 1037. The district court then ordered counsel to select ten additional test cases for trial, and the investors filed the objections that became the basis of the appeal.

permitted to file briefs and exhibits with the district court, and because, except for dispensing with the filing of a complaint and answer, the district court applied the Federal Rules of Evidence and Civil Proce-dure.[9] *See Universal Financial,* 760 F.2d at 1037.

In light of our decision in *Universal Financial,* deLusignan's jurisdictional and procedural challenges to the disgorgement

Our court, like many others, has recognized that as part of courts' equitable powers under the Securities Acts of 1933 and 1934, it may impose receiverships in securities fraud actions to prevent further dissipation of defrauded investors' assets. *SEC v. Wencke,* 622 F.2d at 1369 ("The federal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC.... This circuit has repeatedly approved imposition of a receivership.... [T]he authority derives from the inherent power of a court of equity to fashion effective relief."); *see also Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 391, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970) ("[W]e cannot fairly infer from the Securities Exchange Act of 1934 a purpose to circumscribe the courts' power to grant appropriate remedies."); *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 288, 61 S.Ct. 229, 233, 85 L.Ed. 189 (1940); 3 L. Loss, *Securities Regulation* 1513–14 & n. 117, 1805–08, 1828 & n. 482 (2d ed. 1961); Farrand, *Ancillary Remedies in SEC Civil Enforcement Suits,* 89 Harv.L.Rev. 1779, 1784–89 (1976). Similarly, courts may require disgorgement of diverted assets in securities fraud actions. *See Manor Nursing,* 458 F.2d at 1104; *see also* Ellsworth, *Disgorgement in Securities Fraud Actions Brought by the SEC,* 1977 Duke L.J. 641; Farrand, *supra,* at 1800–05; 3 L. Loss, *supra,* at 1805–08, 1824–29. No specific statutory provision authorizes the creation of securities receiverships or imposition of a disgorgement remedy; *a fortiori,* no statute authorizes courts to employ summary procedures in actions involving these receiverships.

Yet there are compelling reasons to permit the use of summary post-judgment proceedings in such cases, as long as the requirements of *Universal Financial* are satisfied. The use of such proceedings enables a receiver to consolidate all litigation concerning his receivership in a single district court and before a single district judge, and to avoid formalities that would slow down the resolution of disputes. This promotes judicial efficiency and reduces litigation costs to the receivership. *See Smith v. American Industrial Research Corp.,* 665 F.2d 397, 399 (1st Cir. 1981) ("Sound judicial management requires that the equities and priorities among claimants to receivership assets normally be determined in [a single] receivership proceeding...."). The primary purpose of allowing courts to establish receiverships in securities fraud actions is to prevent further dissipation of the assets of the defrauded investors; the use of summary post-judgment proceedings helps to effectuate this.

**9.** DeLusignan contends that the Supreme Court's decision in *New Hampshire Fire Insurance Co. v. Scanlon,* 362 U.S. 404, 80 S.Ct. 843, 4 L.Ed.2d 826 (1960), flatly precludes the use of summary, rather than plenary, proceedings in this case, since there is no express statutory authorization for the use of such procedures in the present context. We do not read *Scanlon* so broadly.

The Supreme Court said in *Scanlon* that "[i]n the absence of express statutory authorization, courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law." *Id.* at 407, 80 S.Ct. at 845 (citations omitted). We agree that courts should be "reluctant" to authorize the use of summary proceedings unless there is a strong reason for doing so. In many cases, the use of summary proceedings would deprive parties of a full and fair opportunity to prepare and present their claims and defenses, and therefore, such proceedings cannot be employed. However, under the pragmatic analysis we applied in *Universal Financial,* courts are not flatly barred from employing summary proceedings when parties have been given an opportunity to prepare and present their contentions. The Supreme Court noted in *Scanlon* that there are a wide variety of types of "summary" trials that courts can provide: the term encompasses trials that "may be conducted without formal pleadings, on short notice, without summons and complaints, generally on affidavits, and sometimes even *ex parte.*" *Id.* at 406, 80 S.Ct. at 845. The Court plainly did not announce a blanket rule covering all these types of summary trials. *See id.* at 406–10, 80 S.Ct. at 845–47.

Some courts have interpreted *Scanlon* to permit courts to employ summary procedures "for adjudication of ... matter[s] ancillary to a pending judicial proceeding," such as the present dispute over disgorgement. *See e.g., Application of Howard,* 325 F.2d 917, 919 (3d Cir.1963); *see also SEC v. Investors Security Corp.,* 560 F.2d 561, 567 (3d Cir.1977) (holding that when "receiver acted within the powers delegated by the [trial] court to accomplish ends sought by the underlying action, [such as] protect[ing defrauded] investors and creditors, the district court had jurisdiction over the proceeding ... as an ancillary matter"); *Tcherepnin v. Franz,* 485 F.2d 1251, 1255–56 (7th Cir.1973) (same), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974); *Esbitt v. Dutch-American Mercantile Corp.,* 335 F.2d 141, 142 (2d Cir.1964) (same). Our decision in *Universal Financial,* although not referring specifically to *Scanlon,* is consistent with these cases.

proceedings must fail. DeLusignan has failed to demonstrate how he and Ramapo were prejudiced by the fact that the disgorgement proceedings were summary in nature, or that they would have been better able to defend their interests in a plenary proceeding. DeLusignan and Ramapo had notice of the disgorgement proceedings directed against them: the Receiver served them with the disgorgement application, naming them as parties subject to disgorgement, over two years before the magistrate and district court held disgorgement hearings. Nothing prevented deLusignan or Ramapo from filing a responsive pleading to the disgorgement application or seeking discovery at any time between 1981 and the issuance of the district court's disgorgement order in November, 1983. DeLusignan did nothing during that time on behalf of himself or Ramapo.

Although deLusignan was deposed for a total of five days in 1977 and 1981, nothing in the record indicates that he *sought* any discovery on behalf of himself or Ramapo. DeLusignan and Ramapo were given the opportunity to introduce evidence and to call and cross-examine witnesses in the hearings before the magistrate and district court. Yet deLusignan's counsel merely entered a "special appearance". Even though the target of disgorgement sought by the Receiver appears to have changed late in the process, deLusignan and Ramapo had seventeen days between the issuance of the magistrate's recommendations, suggesting disgorgement of Ramapo's PSI holdings, and the district court's hearing on those recommendations. DeLusignan made no objections on the merits and did not request additional time to do so.

Given our decision in *Universal Financial* and given "all of the procedural protections" available to deLusignan and Ramapo in the district court's disgorgement proceedings, *see Universal Financial,* 760 F.2d at 1037, we reject deLusignan's contentions that the use of summary proceedings and the lack of a formal complaint, answer, and summonses voids the district court's disgorgement order.

### 2. Due Process Challenges

■ DeLusignan contends that his and Ramapo's due process rights were violated, because they were given only nineteen days to prepare for the disgorgement hearing before the magistrate, and because the relief sought by the Receiver was altered at a late stage of the district court proceedings. We reject these claims. DeLusignan and Ramapo were served with the Receiver's disgorgement application well over two years before the Receiver noticed a hearing on the matter. DeLusignan and Ramapo never sought a continuance even after the hearing on the disgorgement application had been noticed.

Nor can deLusignan and Ramapo contend that they were "surprised" by the change in the nature of the disgorgement sought by the Receiver. The Receiver's original disgorgement application listed Ramapo, as well as deLusignan, as a "party subject to disgorgement." Thus, deLusignan cannot claim that the Receiver's attempt to obtain disgorgement of Ramapo's PSI holdings was unexpected. As noted above, the magistrate issued his recommendation that Ramapo disgorge its PSI holdings on October 7, 1983. During the seventeen days prior to the district court's hearing on that recommendation, and the thirty-one days before the district court adopted the recommendation, deLusignan never sought a continuance so that he might respond to the different form of relief allegedly being sought.

Thus, since deLusignan and Ramapo should have been aware for over two years that the Receiver might seek disgorgement by Ramapo of its PSI holdings, and since deLusignan had ample opportunity to request additional preparation time if he had been surprised by the approaching hearing date or the magistrate's recommendation, we conclude that deLusignan's and Ramapo's due process rights were not violated. Because deLusignan's challenges to the district court's order and proceedings are

without merit, we affirm the disgorgement of Ramapo's PSI holdings.[10]

AFFIRMED.

---

10. Since the district court's disgorgement order is directed exclusively at Ramapo, the district court's decision and our affirmance do not preclude deLusignan from asserting any claims he may have on his own behalf based on his employment agreement with Wencke, possible fraud or misrepresentation by Wencke, the "quantum meruit" value of the services he provided between 1972 and 1977 to Ramapo and PSI, and his rights as a minority shareholder of Ramapo. The evidence in the record supports the district court's finding that Ramapo purchased its PSI holdings with funds diverted from Time, Santa Fe, and their subsidiaries. Thus, the district court's order requiring Ramapo to disgorge its PSI shares was proper.

As it currently stands, however, the record does not support a finding that deLusignan conspired or cooperated with Wencke in his fraudulent activities, and does not support any other finding that would require disgorgement by deLusignan of his Ramapo shares. No such finding was necessary to the district court's disgorgement order. We recognize that the findings drafted by the Receiver's counsel and ultimately adopted by the district court include a finding that deLusignan knowingly participated in Wencke's securities fraud. However, since that finding is not essential or even relevant to the district court's disgorgement order directed at Ramapo, which is the subject of this appeal, the lack of factual support for it does not necessitate reversal.