[No. B181837. Second Dist., Div. Three. Jan. 29, 2007.]

ACS SYSTEMS, INC., et al., Plaintiffs and Appellants, v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY et al.,
Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part IV.E.

138

COUNSEL

Wright, Robinson, Osthimer & Tatum, Charles H. Horn and Brian S. Inamine for Plaintiffs and Appellants.

Michelman & Robinson and Carol Boyd for Defendants and Respondents.

OPINION

**KITCHING, J.—**

## I. INTRODUCTION

This case presents the question whether a liability insurer providing coverage for "advertising injury" and "property damage" is required to defend its insured in an action charging the insured with sending unsolicited advertisements to fax machines in violation of the federal Telephone Consumer Protection Act of 1991 (TCPA) (47 U.S.C. § 227(b)(1)(C)), and with invasion of privacy caused by those faxed advertisements.

Because we hold that the advertising injury and property damage provisions of the insurance policy did not provide coverage for liability for violations of the TCPA or for invasion of privacy caused by the sending of unsolicited faxed advertisements, we conclude that no potential for coverage

existed and no duty to defend arose. The trial court correctly sustained a demurrer without leave to amend and entered a judgment of dismissal, and we affirm.

## II.   PROCEDURAL AND FACTUAL HISTORY

This appeal involves commercial package policies issued by St. Paul Fire and Marine Insurance Company and by St. Paul Mercury Insurance Company. These companies will be referred to as "St. Paul." The policies insured Fidelity National Title Insurance Company, ACS Systems, Inc. (ACS), and others. Fidelity National Title Insurance Company is the parent corporation of Micro General Corporation, the successor in interest through merger of ACS.

*The Underlying Action, Kaufman v. ACS Systems, Inc.*: On January 3, 2000, ACS was named as a defendant in the Los Angeles County Superior Court action, *Kaufman v. ACS Systems, Inc.* (No. BC 222588). The *Kaufman* class action lawsuit alleged violations of the TCPA, which prohibits sending unsolicited advertisements to fax machines (47 U.S.C. § 227(b)(1)(C)), violations of California's unfair competition laws (Bus. & Prof. Code, § 17200 et seq.), negligence, and invasion of privacy.

*St. Paul's Denial of Coverage for Defense and Indemnity*: On January 25, 2000, ACS notified St. Paul of the *Kaufman* complaint. On April 4, 2000, stating that the policy did not cover the type of invasion of privacy alleged in the *Kaufman* complaint, St. Paul informed ACS that it denied coverage for defense and indemnity.

*The ACS Complaint Against St. Paul*: On November 3, 2003, ACS filed a complaint for breach of contract, equitable subrogation, implied indemnity, and declaratory relief against St. Paul. After the trial court sustained St. Paul's demurrers with leave to amend, ACS filed a first amended complaint on August 4, 2004, which is the operative complaint.

*Allegations of the ACS Complaint*: Pursuant to the applicable standard of review,[1] the operative complaint sets forth the following facts. St. Paul issued

---

[1] A demurrer tests the legal sufficiency of factual allegations in a complaint. (*Title Ins. Co. v. Comerica Bank—California* (1994) 27 Cal.App.4th 800, 807 [32 Cal.Rptr.2d 735].) In reviewing the sufficiency of a complaint against a general demurrer, this court treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. This court also considers matters that may be judicially noticed. When a demurrer is sustained, this court determines whether the complaint states facts sufficient to constitute a cause of action. When a demurrer is sustained without leave to amend, this court decides whether a reasonable possibility exists that amendment may cure the defect; if it can we reverse, but if not we affirm. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

commercial package policy No. RP06649251 insuring ACS, among others. The policy included commercial general liability and umbrella liability insurance, and was in effect from February 1, 1998 to February 1, 1999, and from February 1, 1999 to April 1, 2000.

The commercial general liability policy included St. Paul's duty to defend any insured in suits alleging injury or damage resulting from property damage caused by an event, or caused by an advertising injury offense committed during the policy term.

*Provisions of the Policy Obligating St. Paul to Pay for Damages for Covered Advertising Injury or Property Damages*: The relevant portions of the St. Paul commercial general liability policy[2] describe what the policy covers:

"**Bodily injury and property damage liability**. We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury, property damage, or premises damage that:

"• happens while this agreement is in effect; and

"• is caused by an event."

"**Advertising injury liability**. We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:

"• results from the advertising of your products, work or completed work; and

"• is caused by an advertising injury offense committed while this agreement is in effect."

"*Advertising injury* means injury, other than bodily injury or personal injury, caused by an advertising injury offense.

"*Advertising injury offense* means any of the following offenses:

"• Libel or slander.

"• Making known to any person or organization written or spoken material that belittles the products, work or completed work of others.

---

[2] The St. Paul umbrella policy uses slightly different wording in some of its provisions, but we do not regard these differences as significant.

"• Making known to any person or organization written or spoken material that violates an individual's right of privacy.

"• Unauthorized taking or use of any advertising idea, material, slogan, style or title of others.

"*Advertising* means attracting the attention of others by any means for the purpose of seeking customers or increasing sales or business."

"*Property damage* means:

"• physical damage to tangible property of others, including all resulting loss of use of that property; or

"• loss of use of tangible property of others that isn't physically damaged."

"*Event* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

In the underlying lawsuit, the *Kaufman* plaintiffs alleged that ACS, a software company, used the services of DataMart Information Services Corporation (DataMart) to send 13,919 unsolicited faxes to 8,216 recipients in 1998 and 1999.

*The ACS Complaint Alleges Three Breach of Contract Causes of Action*: The first cause of action for breach of contract alleged that the *Kaufman* complaint sued ACS for "property damages," seeking damages for actual losses incurred by recipients of unwanted faxes, which included use of recipients' paper and loss of use of fax machines while they printed faxed advertisements. Because the *Kaufman* complaint alleged that ACS was liable for "property damages" under the policy, the ACS complaint alleged that St. Paul breached its contracts with ACS by refusing to defend ACS in the *Kaufman* litigation.

The first cause of action alleged that ACS contracted with DataMart, an advertising agency, to promote the services of ACS, and that ACS itself did not send the faxes that are the subject of the *Kaufman* suit. The complaint alleged that ACS did not authorize DataMart to send faxes in violation of any law, and at most negligently failed to assure that DataMart sent faxes only to persons giving express or implied permission to receive them. The complaint alleged that ACS reasonably believed that recipients of faxes sent

by DataMart gave express or implied permission to receive them, and that whether the faxes caused damages depended on the perspective of those receiving them. The complaint also alleged that where the insured's conduct resulted in accidental damages from the fax recipient's perspective, it constituted an "event" for purposes of the "accident" requirements of liability policies.

A second breach of contract cause of action alleged that the *Kaufman* complaint sued ACS for damages for "advertising injury." Invasion of privacy causes of action in the *Kaufman* complaint alleged that unsolicited faxes from ACS invaded the *Kaufman* plaintiffs' solitude and violated their common law and California constitutional rights of privacy. The ACS complaint also alleged that ACS had an objectively reasonable expectation that coverage for "advertising injury" in the St. Paul policies extended to all torts recognized as an "invasion of privacy" in California law. The ACS complaint alleged that St. Paul breached its contracts with ACS by claiming that "advertising injury offenses" in the policies provided no coverage and by refusing to defend ACS in the *Kaufman* litigation.

The ACS complaint alleged a third cause of action for breach of contract for "advertising injury" based on umbrella liability coverage, which included coverage for invasion of privacy torts alleged in the *Kaufman* complaint. This cause of action alleged that St. Paul's refusal to defend ACS in the *Kaufman* litigation breached St. Paul's umbrella liability policies.

The ACS complaint also brought causes of action for equitable subrogation and for indemnification, which alleged that St. Paul should pay ACS's attorney fees incurred in defending the *Kaufman* litigation, which attorney fees had been paid by Micro General Corporation and Fidelity National Information Solutions, Inc. A declaratory relief cause of action sought a declaration of the obligations of ACS, Micro General Corporation, and Fidelity National Information Solutions, Inc., which contended that ACS was entitled to a defense and indemnity in the *Kaufman* litigation, and of St. Paul, which denied those obligations.

*St. Paul's Demurrer*: St. Paul demurred to the first amended complaint, arguing that (1) intended conduct is not an accident, whether or not the resulting damage was intended; (2) sending unsolicited faxes could not be "making known . . . material that violates an individual's right of privacy"

because the content of faxed advertisements did not include private material about recipients of the faxes; and (3) no insured could have an objectively reasonable expectation that it could shift the consequences of such illegal activity to its insurer.

ACS's opposition argued that ACS had an objectively reasonable expectation of coverage for all types of invasion of privacy reasonably within the policies' advertising injury provisions, which did not restrict coverage to fewer than all four "invasion of privacy" torts; and ACS had a reasonable expectation of coverage for property damage, because the policies' insuring agreements for property damage liabilities, using "event" rather than "occurrence," included an occurrence, incident, consequence or result, and was not limited to unexpected or unintended conduct or damages.

*Sustaining of the Demurrer and Appeal by ACS*: The trial court sustained the demurrer without leave to amend. After the court filed a judgment of dismissal, ACS timely filed a notice of appeal.

## III. ISSUES

In the published portion of this opinion, we address plaintiffs' claims that:

1. A duty to defend exists for advertising injury liabilities; and

2. A duty to defend exists for property damage liabilities.

## IV. DISCUSSION

A. *The Insurer Owes a Duty to Defend Only if the Liability Policy Provides a Potential for Coverage*

By this action ACS seeks to require St. Paul, based on the duty to defend contained in the insurance policies, to defend ACS against the *Kaufman* plaintiffs' claims. "[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The nature and kinds of risks covered by the insurance policy establish the scope of the duty to defend. (*Ibid.*) "It is the potential for coverage under a particular policy, and in light of the specific pleadings and known facts of the third party claim, which establishes the insurer's obligation to defend."

(*Mez Industries, Inc. v. Pacific Nat. Ins. Co.* (1999) 76 Cal.App.4th 856, 877 [90 Cal.Rptr.2d 721].) "[I]f, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 655 [31 Cal.Rptr.3d 147, 115 P.3d 460].) The interpretation of an insurance policy is a question of law. (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568].) We therefore examine the "advertising injury" and "property damage" provisions to make a determination, as a question of law, whether the St. Paul policy provided a potential for coverage of claims in the *Kaufman* litigation against the insured, ACS.

B. *The Interpretation of Insurance Policies*

■ The interpretation of an insurance policy corresponds to the interpretation of contracts generally. The parties' mutual intention when they form the contract governs interpretation; "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) "If possible, we infer this intent solely from the written provisions of the insurance policy. [Citation.] If the policy language 'is clear and explicit, it governs.' [Citation.] [¶] When interpreting a policy provision, we must give its terms their ' "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' [Citation.] We must also interpret these terms 'in context' [citation], and give effect 'to every part' of the policy with 'each clause helping to interpret the other.' " (*Palmer v. Truck Ins. Exchange, supra*, 21 Cal.4th at p. 1115.) "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 18.)

■ "On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer." (*Bank of the West v. Superior Court, supra*, 2 Cal.4th at pp. 1264–1265.)

Thus in determining whether a policy provides coverage based on policy language that is claimed to be ambiguous, the court "must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because *'language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.'* " (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265.)

C.  *The "Advertising Injury" Provision of the St. Paul Policy Does Not Provide Liability Coverage for TCPA Violations or for Invasion of Privacy Arising from Unsolicited Faxed Advertisements*

ACS claims that the *Kaufman* action alleges a particular invasion of privacy, the " 'unreasonable intrusion upon the seclusion of another,' "[3] that this tort is included within the definition of "advertising injury offense" in the St. Paul policy, and that the St. Paul policy therefore covered this liability and St. Paul owed ACS a duty to defend. We disagree.

As we have seen, the advertising injury liability provision obligated St. Paul to indemnify and to provide a defense for damages for covered advertising injury "caused by an advertising injury offense committed while this agreement is in effect." The policies define four advertising injury offenses:

"Libel or slander.

"Making known to any person or organization written or spoken material that belittles the products, work or completed work of others.

*"Making known to any person or organization written or spoken material that violates an individual's right of privacy.*[4]

---

[3] California recognizes four common law claims for invasion of privacy: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places the other in a false light before the public. (*Sanchez-Scott v. Alza Pharmaceuticals* (2001) 86 Cal.App.4th 365, 372 [103 Cal.Rptr.2d 410]; Rest.2d Torts, § 652A, p. 376.)

[4] The umbrella policy definition of this advertising offense refers to "written or spoken material that violates a person's right of privacy." We do not regard this slight variation in wording as significant.

"Unauthorized taking or use of any advertising idea, material, slogan, style or title of others." (Italics added.)

ACS argues that the italicized advertising injury offense provided liability coverage for the allegations in the *Kaufman* complaint. The *Kaufman* complaint alleged that defendants (ACS and DataMart) faxed thousands of unsolicited advertisements for ACS to facsimile machines of persons, businesses, and entities in California, which violated the TCPA and Business and Professions Code section 17200, negligently breached duties (owed to persons who received their advertisements) to advertise in a lawful manner that complies with these statutes, and invaded the plaintiffs' privacy in violation of common law and rights of privacy under the California Constitution.

The issue in this appeal is whether the conduct alleged in the *Kaufman* suit constitutes the "advertising injury offense" of "[m]aking known to any person or organization written or spoken material that violates an individual's right of privacy" in the St. Paul policy.

We examine both the text—the written advertising injury provision—of the St. Paul insurance policy, and interpret this provision in context, giving effect to every part of the policy with each clause helping to interpret the others. (*Palmer v. Truck Ins. Exchange, supra*, 21 Cal.App.4th at p. 1115.) By interpreting the text of the advertising injury offense—"[m]aking known to any person or organization written or spoken material that violates an individual's right of privacy"—and by analyzing this provision in the context in which it appears in the St. Paul policy, we conclude that the policy does not provide liability coverage for the conduct alleged in the *Kaufman* suit.

### 1. The "Right of Privacy": Seclusion and Secrecy

The courts have found it analytically helpful to identify two meanings for "the right of privacy": "secrecy" and "seclusion." (*Resource Bankshares v. St. Paul Mercury Ins. Co.* (4th Cir. 2005) 407 F.3d 631, 640–641 (*Resource Bankshares*); *American St. Ins. v. Capital Assoc. Jackson Co.* (7th Cir. 2004) 392 F.3d 939, 941 (*American States*).) "A person who wants to conceal a criminal conviction, bankruptcy, or love affair from friends or business relations asserts a claim to privacy in the sense of secrecy. A person who wants to stop solicitors from ringing his doorbell and peddling vacuum cleaners at 9 p.m. asserts a claim to privacy in the sense of seclusion." (*American States*, at p. 941.) Thus a person claiming the privacy right of seclusion asserts the right to be free, in a particular location, from disturbance

*by* others. A person claiming the privacy right of secrecy asserts the right to prevent disclosure of personal information *to* others. Invasion of the privacy right of seclusion involves the *means, manner, and method* of communication in a location (or at a time) which disturbs the recipient's seclusion. By contrast, invasion of the privacy right of secrecy involves the *content* of communication that occurs when someone's private, personal information is disclosed to a third person. (*Id.* at p. 943.)

St. Paul contends that its policy provision provides coverage for invasions of a person's secrecy privacy, which the *Kaufman* complaint did not allege against ACS. ACS contends that the St. Paul policy provision provides coverage for the invasions of a person's seclusion privacy which were alleged in the *Kaufman* complaint. We must decide which of these two mutually exclusive interpretations is correct.

By alleging violations of the TCPA, the *Kaufman* suit alleged the violation of "seclusion" privacy. (*Resource Bankshares, supra*, 407 F.3d at p. 641; see also 47 U.S.C. § 227; Cong. Statement of Findings, Pub.L. No. 102-243, § 2 (Dec. 20, 1991) 105 Stat. 2394; *American States, supra*, 392 F.3d at pp. 942–943.) Our task, however, is not to identify which privacy right is enforced by 47 United States Code section 227(b)(1)(C) of the TCPA. The issue is whether the "advertising injury offense" provision of the St. Paul policy creates a potential for coverage of claims in the *Kaufman* suit brought under this TCPA statute. (See *American States*, at p. 942.) We find that both the text of the advertising injury offense at issue and the context in which that advertising injury offense appears in the St. Paul policy confirm that the policy did not provide liability coverage for claims in the *Kaufman* suit.

### 2. *Analysis of the Text*

The text of the advertising injury offense at issue is "making known to any person or organization written or spoken material that violates an individual's right of privacy." It is true that sending unsolicited faxed advertisements constitutes a "making known" of "written . . . material" to the recipient. Under the St. Paul policy, however, making known written material is not enough to trigger coverage. Coverage requires an additional element, the making known of "material" that violates a person's right of privacy. That is, the *content* of the "material" violates someone's right of privacy when that material is "made known." " '[M]aking known' implies telling, sharing or otherwise divulging, such that the injured party is the one whose private material is *made known*, not the one *to whom* the material is made known." (*Resource Bankshares, supra*, 407 F.3d at p. 641, original italics.)

Thus the coverage applies to liability for injury caused by the disclosure of private *content* to a third party—to the invasion of "secrecy privacy" caused by "making known" to a third party "material that violates an individual's right of privacy." The coverage does not apply to injury caused by receipt of an unauthorized advertising fax, because in that case no disclosure of private facts to a third party has occurred: The recipient of an unauthorized advertising fax has no claim that "material that violates an individual's right of privacy" has been "made known" to a third party.

■ The "last antecedent rule" underscores this interpretation. The last antecedent rule provides that " ' "qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote." ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 [110 Cal.Rptr.2d 828, 28 P.3d 876].) Ordinarily the last antecedent rule applies to statutory construction, but it has also been stated to apply to contracts (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 529 [132 Cal.Rptr.2d 151]) and has been used specifically to interpret insurance policy language. (*Anderson v. State Farm Mut. Auto. Ins. Co.* (1969) 270 Cal.App.2d 346, 349 [75 Cal.Rptr. 739]; *State Farm Mut. Auto. Ins. Co. v. Eastman* (1984) 158 Cal.App.3d 562, 569 [204 Cal.Rptr. 827].) Considered grammatically, the word "that" in "[m]aking known to any person or organization written or spoken material that violates an individual's right of privacy" can reasonably be interpreted only to refer to "material." We find that "material" is not only the last antecedent of "that" but is also its only antecedent. "That" does not refer to "making known." Thus this particular advertising offense only refers to "material that violates an individual's right of privacy," and does not refer to a "making known that violates an individual's right of privacy."

Nothing in the *content* of the "written or spoken material" in unsolicited faxed advertisements violated the recipients' secrecy right of privacy. The faxes contained no facts about the recipients, and did not disclose or "make known" any private information about the recipients to third parties. (See *St. Paul Fire and Marine Ins. v. Brunswick Corp.* (N.D.Ill. 2005) 405 F.Supp.2d 890, 895.) Analyzing the same St. Paul policy language as that in this appeal, *Resource Bankshares, supra,* 407 F.3d 631, concluded: "It requires undue strain to believe that sending an unsolicited fax ad that has no private information or content (but rather simply advertised fairly the sender's wares) can reasonably be said to 'mak[e] known' material that violates a person's right to privacy. . . . [T]he plainest and most common reading of the

phrase indicates that 'making known' implies telling, sharing or otherwise divulging, such that the injured party is the one whose private material is *made known*, not the one *to whom* the material is made known." (*Id.* at p. 641, fn. omitted.)

Therefore the faxes did not violate the recipients' right of privacy so as to constitute an "advertising injury offense," and this provision of the St. Paul policy did not provide a potential for coverage.

### 3. *Analysis of the Context*

We interpret an insurance policy provision by giving effect to every part of the policy, with each clause helping to interpret the other, so as to avoid finding ambiguity in the abstract and in order instead to construe language in the context of the contract as a whole. (*Palmer v. Truck Ins. Exchange, supra,* 21 Cal.4th at p. 1118.) The St. Paul policy definitions of "advertising injury offenses" provide a context that clarifies the meaning of the provision at issue in this appeal.

As stated, the St. Paul policy defines four "advertising injury offenses." The first, "libel or slander," involves a publication of defamatory content about someone to a third person. (Civ. Code, §§ 45, 46; *Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1284 [286 Cal.Rptr. 198]; *Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645 [85 Cal.Rptr.2d 397].) The second, "[m]aking known to any person or organization written or spoken material that belittles the products, work or completed work of others," likewise involves a publication to a third person of content that belittles someone's products, work or completed work. The fourth advertising injury offense involves the unauthorized taking or use of content—of someone else's "advertising idea, material, slogan, style or title." These three advertising injury offenses therefore all involve the insured's making known or unauthorized taking or use of *content* which injures someone. Interpreting "[m]aking known to any person or organization written or spoken material that violates an individual's right of privacy" in the context of the other three advertising injury offenses leads to the conclusion that it likewise involves not the mere communication or "making known" of written or spoken material. The covered advertising injury offense involves communication or making known of written or spoken material whose content injures someone else. Interpreting a St. Paul insurance policy containing these same four definitions of advertising injury, *Resource Bankshares, supra,* 407 F.3d 631

stated: "[T]hese four offenses all share the common thread of assuming that the victim of the advertising injury offense is harmed by the sharing of the *content* of the ad, not the mere *receipt* of the advertisement." (*Id.* at p. 641, original italics.)

Therefore the St. Paul advertising injury offense before us provides coverage only if the harmful content violates the secrecy right of privacy, and does not provide coverage for a violation of the seclusion right of privacy. The TCPA prohibits the faxing of unsolicited advertising rather than prohibiting or regulating advertising content itself. By focusing on the means, manner, and method—the faxing—of the advertising, the TCPA protects the seclusion right of privacy. (*Resource Bankshares, supra*, 407 F.3d at p. 642.) The three other advertising injury offenses in the St. Paul policy provide coverage for liability arising from injury to the secrecy privacy right caused by the publication or taking or use of content. Given this context, it would be unreasonable to give a different interpretation to the advertising injury offense at issue. It likewise does not cover liability for injury caused by the mere sending of unsolicited faxes; "[m]aking known to any person or organization written or spoken material that violates an individual's right of privacy" provides liability coverage only when the content of an unsolicited fax (or other spoken or written material) causes injury to someone else by violating that person's secrecy right of privacy.

All four advertising offenses involve violations of the "secrecy" right of privacy. None of them involves the "seclusion" right of privacy—the right claimed to have been violated in the *Kaufman* litigation. The context of the other three advertising injury offenses indicates that the St. Paul policy did not provide coverage for liability caused by the transmission to a recipient of faxed advertisements whose content (1) contained no private information about the recipient and (2) was not communicated to a third party, and which for both these reasons did not violate the recipient's right of privacy.

4. *Other Case Authority Has Held That the Advertising Injury Offense at Issue Did Not Provide Coverage for TCPA Violations, and Case Authority Provided by ACS Is Distinguishable*

Two federal cases have held that TCPA violations were not covered as an advertising injury offense. *American States, supra*, 392 F.3d 939, also involved a class action suit brought by recipients of unsolicited faxed advertisements against the insured, the sender of the faxes, for violations of the TCPA. The insured tendered defense of the suit to the insurer, claiming coverage under an insurance policy that defined advertising injury as " 'oral or written publication of material that violates a person's right of privacy.' " (392 F.3d at p. 940.) *American States* held that this advertising-injury policy clause

provided coverage for injury arising from violation of secrecy privacy and did not provide liability coverage for the normal consequences of unsolicited faxed advertisements. (*Id.* at p. 943.)

*Resource Bankshares, supra,* 407 F.3d 631, also involved a class action suit brought by recipients of an insured's faxes claiming violations of the TCPA. The insured, Resource Bankshares Corporation, sought a declaration that the class action suit triggered coverage under St. Paul insurance policies containing an advertising injury offense identical to that in the St. Paul umbrella policy in this appeal, defining the advertising injury offense as "[m]aking known to any person or organization written or spoken material that violates a person's right of privacy." (407 F.3d at p. 634, italics omitted.) *Resource Bankshares* followed the analysis of seclusion privacy and secrecy privacy in *American States,* and held that the St. Paul advertising injury offense did not provide coverage for injury caused to recipients of unsolicited faxed advertisements in violation of the TCPA. (*Resource Bankshares,* at p. 640.)

ACS relies on cases which, it argues, found that, based on advertising injury policy provisions, insurers owe a duty to defend insureds sued in TCPA cases. These cases are distinguishable because they are based on policy language which differs from the advertising injury offense of "[m]aking known to any person or organization written or spoken material that violates an individual's right of privacy" in the St. Paul policy.

*Universal Underwriters v. Lou Fusz Automotive* (8th Cir. 2005) 401 F.3d 876 found that a complaint against an insured for violations of the TCPA alleged an "injury," defined by the insurance policy to include " 'private nuisance (except pollution), [and] invasion of rights of privacy or possession of personal property,' " without limiting, defining, or qualifying these terms in any way. (401 F.3d at p. 881.)

*Park Univer. Enter. v. Am. Cas. Co., Reading, PA.* (D.Kan. 2004) 314 F.Supp.2d 1094 found that an insurer owed a duty to defend an insured, which was sued for violations of the TCPA, based on policy language requiring the insurer to pay an insured's damages caused by an " 'advertising injury,' " defined as " 'injury . . . arising out of . . . oral or written publication of material that violates a person's right of privacy,' " where the policy did not define "right of privacy" or " 'oral or written publication.' " (*Park Univ. Enter.,* at pp. 1099, 1106, 1108–1110, affd. (10th Cir. 2006) 442 F.3d 1239, 1248–1251.) The other cases reached the same result based on the same insurance policy language. (*Hooters of Augusta, Inc. v. American Global Ins. Co.* (S.D.Ga. 2003) 272 F.Supp.2d 1365, 1371–1374; *Western Rim Inv. Advisors, Inc. v. Gulf Ins. Co.* (N.D.Tex. 2003) 269 F.Supp.2d 836, 845–847; *Prime TV, LLC v. Travelers Ins. Co.* (M.D.N.C. 2002) 223 F.Supp.2d 744, 748,

752–753; and *TIG Ins. Co. v. Dallas Basketball, Ltd.* (Tex.App. 2004) 129 S.W.3d 232, 237–239.)

### 5. *Conclusion*

■ Because the "advertising injury offense" provision in the insurance policies did not cover ACS's conduct which was alleged in the *Kaufman* litigation, St. Paul had no duty to defend ACS under that provision.

### D. *The "Property Damage" Provision of the St. Paul Policy Does Not Provide Liability Coverage for TCPA Violations or for Invasion of Privacy Arising from Unsolicited Faxed Advertisements, and the Policy Specifically Excludes Intentional Property Damage from Coverage*

The insurance policies obligate St. Paul to pay amounts any protected person is legally required to pay as damages for covered property damage "that happens while this agreement is in effect; and is caused by an event." The policies define "property damage" to mean "physical damage to tangible property of others, including all resulting loss of use of that property; or loss of use of tangible property of others that isn't physically damaged." The commercial general liability policy further states: "We'll consider all loss of use of damaged tangible property to happen at the time of the physical damage which caused it. And we'll consider all loss of use of undamaged tangible property to happen at the time of the event which caused it."[5] Under the policies, an "event" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

ACS argues that facts alleged in the *Kaufman* action—that faxing unsolicited ads consumes the recipients' ink and paper—constitute "physical damage to tangible property of others," and also "loss of use of tangible property of others" while a fax machine receives the unsolicited advertisement. ACS therefore claims that allegations in the *Kaufman* complaints implicate both definitions of "property damage," that this property damage was alleged to have happened during the terms of the St. Paul policies, and that the trial court erroneously found that those facts did not constitute an "event" necessary to trigger insurance coverage.

The *Kaufman* complaint did not specifically cite the consumption of ink and paper by unsolicited faxed advertisements, but instead referred to "a shifting of advertisement costs from defendants onto the persons, businesses

---

[5] The umbrella policy contained similar language: "We'll consider all loss of use of: damaged tangible property to happen at the time of the physical damage which caused it; and undamaged tangible property to happen at the time of the event which caused it."

and entities who have received these faxes." The *Kaufman* complaint asserted statutory damages for TCPA violations under section 227(b)(3) of the TCPA.

■ Assuming without deciding that the *Kaufman* complaint alleged "property damage," the St. Paul policy did not provide coverage, for two reasons. First, this property damage was not caused by an "event" because the fax transmissions were not an "accident." An "accident" requires unintentional acts or conduct. (*Ray v. Valley Forge Ins. Co.* (1999) 77 Cal.App.4th 1039, 1045 [92 Cal.Rptr.2d 473].) ACS intended the fax transmissions to occur. "[W]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." (*Merced Mutual Ins. Co. v. Mendez* (1989) 213 Cal.App.3d 41, 50 [261 Cal.Rptr. 273]; see also *Quan v. Truck Ins. Exchange* (1998) 67 Cal.App.4th 583, 598–599 [79 Cal.Rptr.2d 134].)

Second, the St. Paul policy expressly excludes "[i]ntentional bodily injury or property damage" from coverage. A section of the policy captioned "Exclusions—What This Agreement Won't Cover" states, in relevant part: "We won't cover bodily injury or property damage that's expected or intended by the protected person." This exclusion reiterates the concept that the St. Paul policy does not cover property damage not caused by an "event"—that is, which is not accidental. "Because *every* junk fax invades the recipient's property interest in consumables, this normal outcome is not covered" by the St. Paul policy. (*American States, supra,* 392 F.3d at p. 943.) The sender of a fax necessarily anticipates and intends the consequence that printing the faxed document will use the recipient's ink and paper and will cause the recipient's loss of use of the fax machine during transmission. The exclusion for intentional property damage therefore forecloses coverage, because the fax recipient's loss is " 'expected or intended from the standpoint of the insured.' " (*Ibid.*; see also *Resource Bankshares, supra,* 407 F.3d at p. 639.)

For these reasons, the property damage provision of the St. Paul policy provided no coverage, and therefore St. Paul had no duty to defend ACS in the *Kaufman* suit.

E.  *The Trial Court Properly Denied Plaintiff's Untimely Motion for Judgment on the Pleadings*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 137.

## V. DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to defendants St. Paul Fire and Marine Insurance Company and St. Paul Mercury Insurance Company.

Klein, P. J., and Croskey, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 25, 2007, S150870. Corrigan, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.