[No. B212923. Second Dist., Div. Four. Jan. 21, 2010.]

TOTAL CALL INTERNATIONAL, INC., Plaintiff and Appellant, v.
PEERLESS INSURANCE COMPANY, Defendant and Respondent.

**COUNSEL**

The Cronin Law Group and Timothy C. Cronin for Plaintiff and Appellant.

Lindahl Beck, Kelley K. Beck and Andrew Sperry for Defendant and Respondent.

**OPINION**

**MANELLA, J.**—In the underlying action for breach of insurance contract and bad faith, appellant Total Call International, Inc. (TCI), asserted that respondent Peerless Insurance Company (Peerless) had improperly declined to defend TCI in litigation arising out of its advertising activities. The trial court sustained Peerless's demurrer to TCI's complaint without leave to amend. We affirm.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

TCI's complaint against Peerless, filed August 12, 2008, alleges the following facts: TCI provides telecommunication services and products,

including prepaid domestic and international phone cards. The cards enable people, many of whom are immigrants, to make calls to their home countries. The prepaid phone card industry is competitive, and providers such as TCI operate on thin profit margins. Most providers rely on "point of sale" advertising, that is, billboards and posters at gas stations and other places where cards are sold that state the price of the provider's card and amount of paid minutes. Because cost is the determinative factor for most consumers, they typically buy the least expensive card advertised on the billboards and posters.

TCI's complaint further alleges that Peerless issued a commercial general liability policy to TCI, effective from July 13, 2006, to July 13, 2007. The policy's coverage provisions stated: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." The policy defined "[p]ersonal and advertising injury" to mean "injury . . . arising out of" several enumerated "offenses," including the "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Under an exclusion entitled "Quality [o]r Performance of Goods— Failure to Conform [t]o Statements" (nonconformity exclusion), the policy precluded coverage for " '[p]ersonal and advertising injury' arising out of the failure of goods, products or services to conform with any statement of quality or performance made in [the insured's] 'advertisement.' "

TCI's complaint further alleges that in March 2007, two competitors of TCI—namely, IDT Telecom, Inc., and Union Telecard Alliance, LLC (collectively IDT)—sued TCI, alleging that they had suffered damages as the result of TCI's advertising activities. Peerless declined to provide TCI a defense in the IDT action on the ground that IDT had alleged only that TCI's advertising misrepresented TCI's own phone cards. In view of these allegations, Peerless asserted that IDT's claims fell outside the policy's coverage for advertising injury and were otherwise barred from coverage by the nonconformity exclusion. In November 2007, TCI entered into a settlement with IDT.

TCI's complaint asserts claims for breach of insurance contract, bad faith, unfair business practices (Bus. & Prof. Code, § 17200 et seq.), and declaratory relief against Peerless. Peerless demurred to TCI's complaint, contending that Peerless had properly declined to defend TCI in the IDT action. On November 4, 2008, the trial court sustained the demurrer without leave to amend. In ruling, the trial court concluded that although IDT's claims

potentially constituted advertising injury under the policy, they were barred from coverage by the nonconformity exclusion. An order of dismissal was entered in Peerless's favor on November 17, 2008. This appeal followed.

## DISCUSSION

TCI contends the trial court erred in sustaining the demurrer without leave to amend. As explained below, TCI is mistaken.

### A. *Standards of Review*

"Because a demurrer both tests the legal sufficiency of the complaint and involves the trial court's discretion, an appellate court employs two separate standards of review on appeal. [Citation.] . . . Appellate courts first review the complaint de novo to determine whether or not the . . . complaint alleges facts sufficient to state a cause of action under any legal theory, [citation], or in other words, to determine whether or not the trial court erroneously sustained the demurrer as a matter of law. [Citation.]" (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879 [6 Cal.Rptr.2d 151], fn. omitted.) "Second, if a trial court sustains a demurrer without leave to amend, appellate courts determine whether or not the plaintiff could amend the complaint to state a cause of action. [Citation.]" (*Id.* at p. 879, fn. 9.)

Under the first standard of review, "we examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. [Citation.] We treat the demurrer as admitting all material facts which were properly pleaded. [Citation.] However, we will not assume the truth of contentions, deductions, or conclusions of fact or law [citation], and we may disregard any allegations that are contrary to the law or to a fact of which judicial notice may be taken. [Citation.]" (*Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 947 [36 Cal.Rptr.2d 360].) Moreover, because the policy and the competitors' complaint constitute the "foundation" of TCI's claims and are incorporated into TCI's complaint, we may properly rely on these documents in assessing whether TCI's claims are legally tenable. (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 430, p. 564.)

Under the second standard of review, the burden falls upon the plaintiff to show what facts he or she could plead to cure the existing defects in the complaint. (*Cantu v. Resolution Trust Corp, supra,* 4 Cal.App.4th at p. 890.) "To meet this burden, a plaintiff must submit a proposed amended complaint or, on appeal, enumerate the facts and demonstrate how those facts establish a cause of action." (*Ibid.*)

B. *Duty to Defend*

 The key issues presented on appeal concern an insurer's duty to defend.[1] "[I]t is firmly established [that] the duty to defend is broader than the obligation to indemnify. The former arises whenever an insurer ascertains facts that give rise to the possibility or the potential of liability to indemnify. Unlike the duty to indemnify which arises only when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case. . . . [¶] Equally established is that 'when a suit against an insured alleges a claim that potentially or even possibly could subject the insured to liability for covered damages, an insurer must defend unless and until the insurer can demonstrate, by reference to undisputed facts, that the claim cannot be covered.' " (*Pardee Construction Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1350–1351 [92 Cal.Rptr.2d 443], italics omitted, quoting *Borg v. Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 455 [54 Cal.Rptr.2d 811].) The absence of a duty to defend is established when the insurer shows that "the underlying claim [could not] come within the policy coverage by virtue of the scope of the insuring clause or the breadth of an exclusion." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 301 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

 To determine whether Peerless properly declined to provide a defense to TCI, we identify the facts available to it at the time of its denial. "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) Facts extrinsic to the complaint also trigger the duty to defend when they reveal a possibility that the claim may be covered by the policy. (*Id.* at p. 1081.) In the context of a demurrer, the absence of a duty to defend may be established when the allegations in the third party complaint disclose no basis for policy coverage, and the insured's complaint alleges no extrinsic facts that raise a possibility of coverage. (*Michaelian v. State Comp. Ins. Fund* (1996) 50 Cal.App.4th 1093, 1107–1108 [58 Cal.Rptr.2d 133].)

C. *Facts Known to Peerless*

As TCI's complaint against Peerless does not allege extrinsic facts pertinent to the duty to defend, our inquiry is confined to IDT's complaint, which

---

[1] Because the allegation that Peerless breached its duty to defend is the basis for every claim in TCI's complaint, we need not address each claim separately. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 [96 Cal.Rptr.2d 354].)

is incorporated into TCI's complaint. IDT filed its action in federal district court in New Jersey against TCI and several other phone card providers. IDT's complaint asserts claims for deceptive business practices and false advertising under the Lanham Act (15 U.S.C. § 1051 et seq.) and the laws of several states, including California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) and false advertising law (Bus. & Prof. Code, § 17500 et seq.).

IDT's complaint alleged that the prepaid phone card industry generates over $2 billion in annual retail sales revenue. According to the complaint, IDT constituted the leading card provider, with annual sales exceeding $1 billion; TCI and the other defendants collectively made approximately $1 billion in sales. Although consumers of phone cards exhibit a high degree of "brand loyalty" and frequently buy the same brand of card, they are also sensitive to price rates. Consumers receive information about phone cards from advertising and "voice prompts," that is, an automated computer voice that tells a card user the amount of calling time remaining on the card.

IDT's complaint further alleged that because IDT had offered "high quality and low priced services" to consumers, it "ha[d] garnered substantial good will and a loyal customer base for [its] card brands." In contrast, the phone cards sold by TCI and the other defendants "virtually never provide[d] the minutes advertised to consumers on their posters and voice prompts. . . . [IDT's] internal testing demonstrate[d] that [TCI and the other defendants were] systematically lying to consumers about the minutes promised on their posters and voice prompts. . . . [They] . . . provide[d] only approximately 60 [percent] of the minutes promised on their posters and voice prompts, thereby injuring consumers on virtually each and every calling card purchase."

Regarding TCI, IDT's complaint specifically alleged that TCI marketed its cards through "point of purchase posters, television advertisements, radio advertisements, packaging and voice prompts"; that TCI "communicate[d] to consumers that they will receive [a] certain number[] of minutes for a certain cost"; and that the minutes "actually delivered . . . are significantly less than those marketed in [TCI's advertising]." The complaint also alleged that this advertising was "false, misleading and deceptive."

In describing IDT's injuries, the complaint asserted: "Defendants' conduct has damaged and is continuing to damage [IDT's] reputation of being the best value provider of quality calling cards. Defendants' consumer fraud also has taken away from [IDT] a significant share of . . . business. Additionally, [d]efendants' unlawful conduct has damaged the reputation of the prepaid

calling industry." Moreover, in a section entitled "Defendants' Consumer Fraud Has Irreparably Harmed [IDT's] Reputation, Caused Lost Sales, and Caused [IDT] to Incur Exorbitant Costs to Compete with Defendant's Deceptive Rates," the complaint contained the following allegations: "Defendants' consumer fraud is also causing irreparable harm to [IDT's] reputation. Based on brand loyalty created by their high quality and low rate calling cards, [IDT] built a significant market share . . . . Defendants' widespread consumer fraud, however, has destroyed much of this market share, as consumers have been misled to ignore [IDT's] cards and instead purchase [d]efendants' calling card by promises of long distance minutes that were never delivered by [d]efendants. It is unclear whether [IDT] will ever be able to regain this lost market share."

### D. *No Advertising Injury*

We begin by examining whether IDT's complaint potentially alleges an advertising injury under the policy. Notwithstanding the trial court's determination on this matter, we will affirm the demurrer on any properly supported ground, regardless of the trial court's basis for its ruling. (*Cantu v. Resolution Trust Corp., supra,* 4 Cal.App.4th at p. 880, fn. 10.) Appellant contends that it is indisputable that IDT's claims fell within the provision for advertising injury arising out of an "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.' "[2] For the reasons explained below, we reject this contention.

The provision at issue provides coverage for "product disparagement and trade libel as well as defamation." (*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1035 [123 Cal.Rptr.2d 256].) Generally, tortious conduct of this kind "involve[s] the imposition of liability for injuries sustained through publication to third parties of a false statement affecting the plaintiff." (*Polygram Records, Inc. v. Superior Court* (1985) 170 Cal.App.3d 543, 549 [216 Cal.Rptr. 252].) Nonetheless, defamation is distinct from product disparagement and trade libel: whereas the former "concerns injury to the reputation of a person or business," the latter "involves false disparagement of the quality of goods or services." (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 340 [42 Cal.Rptr.3d 607].)

---

[2] We recognize that TCI's complaint against Peerless also mentions a second provision that provides coverage for injury arising out of "[t]he use of another's advertising idea in [the insured's] 'advertisement.' " However, TCI's briefs neither mention this provision nor argue that IDT's claims potentially fell within its scope.

We also note that TCI's briefs suggest that Peerless did not demur on the ground that IDT's claims fell outside the policy coverage for advertising injury. The record conclusively demonstrates otherwise.

As our Supreme Court explained in *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042 [232 Cal.Rptr. 542, 728 P.2d 1177] (*Blatty*), the torts in question require that the injurious false statement "specifically refer to, or be 'of and concerning,' the plaintiff in some way." There, an author sued The New York Times, alleging that he suffered damages when the newspaper omitted his novel from its " ' "[b]est [s]eller" ' " list. (*Id.* at pp. 1036–1037.) The author initially asserted claims for trade libel and interference with prospective economic advantage, but later amended his complaint to omit the claim for trade libel while retaining the underlying factual allegations. (*Id.* at p. 1038.)

After the trial court sustained a demurrer to the amended complaint without leave to amend, the Supreme Court concluded that the ruling was correct. (*Blatty, supra,* 42 Cal.3d at pp. 1048–1049.) Noting that the author's claims in his original and amended complaint had "as their gravamen the alleged injurious falsehood of a statement," the court explained that "*all* injurious falsehood claims" sounding in defamation, however framed, are subject to requirements rooted in the First Amendment to the United States Constitution. (42 Cal.3d at pp. 1043–1045, italics added.) These requirements cannot be avoided by "creative pleading" that "affix[es] labels other than defamation to injurious falsehood claims." (*Id.* at p. 1045.) Among these requirements is the demand that the injurious falsehood "specifically refer[]" to the derogated person or product. (*Id.* at p. 1046.) To meet this demand at the pleading stage, a plaintiff must allege that "the statement at issue either expressly mentions him or refers to him by reasonable implication." (*Ibid.*)

Turning to the author's allegations, the court concluded that the purported injurious falsehood—namely, that the list was an accurate compilation of book sales—did not satisfy the specific reference requirement. (*Blatty, supra,* 42 Cal.3d at p. 1046.) As the court noted, the list expressly mentioned neither the author nor his novel. (*Ibid.*) Moreover, the list could not reasonably be viewed as specifically referring to him or his novel by implication, as nothing in the list distinguished him and his novel from the large number of other omitted authors and novels.[3] (*Blatty,* at p. 1046; see also *Hofmann Co. v. E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 397–401 [248 Cal.Rptr. 384] [trade libel is subject to requirements identified in *Blatty*].)

---

[3] On this matter, the court in *Blatty* explained: "When, as in this case, the statement that is alleged to be injuriously false concerns a group—here, books currently in print and their authors—the plaintiff faces a 'difficult and sometimes insurmountable task. If the group is small and its members easily ascertainable, [the] plaintiff[] may succeed. But where the group is large—in general, any group numbering over twenty-five members—the courts in California and other states have consistently held that plaintiffs cannot show that the statements were "of and concerning them," [citations].' [Citation.] [¶] The group in question here obviously numbers substantially more than 25 members: a visit to even the smallest bookstore establishes this fact." (*Blatty, supra,* 42 Cal.3d at p. 1046.)

■ In view of *Blatty*, IDT's complaint alleges no claim for an injurious false statement potentially within the scope of the policy's coverage for advertising injury. Although IDT's complaint asserts that TCI's falsehoods injured IDT's reputation by reducing IDT's market share and damaging the industry's collective reputation, the complaint contains no allegation suggesting that the falsehoods met the specific reference requirement. On the contrary, IDT's complaint discloses that the requirement was not satisfied.

According to IDT's complaint, TCI's offending advertisements and voice prompts falsely "communicate[d] to consumers that they [would] receive [a] certain number[] of minutes for a certain cost." This sort of communication, by itself, carries *no* implication that IDT's comparable cards cost more or less than TCI's cards; to ascertain such information, a consumer would have to consult IDT's own advertising. As TCI's complaint against Peerless otherwise alleges no extrinsic facts suggesting that its advertisements met the specific reference requirement for defamation-related claims, TCI failed to establish the potential for a covered claim. (See *R. C. Bigelow, Inc. v. Liberty Mutual Ins. Co.* (2d Cir. 2002) 287 F.3d 242, 246 [third party's allegation that insured's advertising misdescribed contents of insured's own product did not establish potential advertising injury for purpose of duty to defend].)

■ TCI suggests that the references in IDT's complaint to its damaged reputation were sufficient to raise the possibility that IDT's claims were covered under the policy. We disagree. The fact that the third party complaint mentions an element of a covered claim does not trigger the duty to defend when the facts known to the insurer, viewed as a whole, establish that no such claim is potentially asserted. (*Quan v. Truck Ins. Exchange* (1998) 67 Cal.App.4th 583, 587, 595–601 [79 Cal.Rptr.2d 134] [notwithstanding allegation in third party complaint that insured acted negligently, insurer had no duty to defend because facts known to the insurer showed that insured's conduct was not accident under policy]; see *Stellar v. State Farm General Ins. Co.* (2007) 157 Cal.App.4th 1498, 1504–1507 [69 Cal.Rptr.3d 350] [third party defamation claim fell outside homeowners' policy coverage for "occurrence" when third party complaint otherwise alleged that defamation was intentional and insureds offered no extrinsic evidence that defamation was accidental].) Moreover, the duty to defend is not triggered by mere speculation "about extraneous 'facts' regarding potential liability or ways in which the third party claimant might [have] amend[ed] its complaint at some future date." (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114 [44 Cal.Rptr.2d 272].)

E. *No Coverage Due to Exclusion*

■ We also conclude that there was no potential for policy coverage in view of the nonconformity exclusion, which bars coverage for advertising injury "arising out of the failure of goods, products or services to conform with any statement of quality or performance made in [the insured's] 'advertisement.' " Several courts have held that this exclusion precludes coverage for third party claims predicated on allegations that the insured's advertising misrepresented the quality or price of the insured's own product.

In *Skylink Technologies, Inc. v. Assurance Co.* (7th Cir. 2005) 400 F.3d 982, 984, a seller of control devices for garage door openers advertised that its devices were compatible with the security features of a manufacturer's opener, but the devices, in fact, disabled the security features. When the manufacturer sued the seller for false advertising, the seller's insurer declined to provide a defense, pointing to the exclusion at issue before us. (*Ibid.*) After the insurer obtained a summary judgment in its favor in the seller's bad faith action, the Seventh Circuit affirmed, reasoning that the manufacturer's claims relied entirely on the allegation that the seller's devices "[did] not live up to the promise of compatibility," and thus coverage for the claims was precluded under the nonconformity exclusion. (*Id.* at pp. 984–985.)

In *New Hampshire Ins. Co. v. Power-O-Peat, Inc.* (8th Cir. 1990) 907 F.2d 58, 58–59, a competitor of the insured sued the insured for deceptive business practices, alleging that the insured's advertising mislabeled the insured's own composted manure products. The Eighth Circuit concluded that the allegations in the third party complaint did not trigger the insurer's duty to defend, reasoning that they were barred by an exclusion essentially similar to that before us. (*Id.* at p. 59.)

Finally, in *Superformance Intern. v. Hartford Cas. Ins.* (E.D.Va. 2002) 203 F.Supp.2d 587, 589–590, a manufacturer of sports cars and related products sued the insured for marketing similar products improperly bearing the manufacturer's name. After the insurer declined to provide a defense in the action, the federal district court concluded that the nonconformity exclusion precluded coverage for the manufacturer's false advertising claims. (*Id.* at p. 598.)

TCI contends that the nonconformity exclusion is ambiguous, and can be reasonably understood as operating to bar coverage for claims by consumers, but not claims by competitors. Pointing to *Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232 [282 Cal.Rptr. 233] (*Aragon-Haas*), TCI argues that we are obliged to accept its proffered interpretation of the

exclusion for purposes of assessing Peerless's demurrer.[4] As the nonconformity exclusion is not ambiguous, we reject TCI's contention.

■ When, as here, an insurance policy is attacked as ambiguous solely on the basis of the policy's language, the challenge presents a question of law properly resolved on demurrer. (*ACS Systems, Inc. v. St. Paul Fire & Marine Ins. Co.* (2007) 147 Cal.App.4th 137, 145–155 [53 Cal.Rptr.3d 786].) ■ Generally, absent special or technical language, "[i]f the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666–667 [42 Cal.Rptr.2d 324, 913 P.2d 878].) Here, the nonconformity exclusion discloses no suggestion that it relates exclusively to consumer claims; its language is broad and unqualified. Moreover, as noted above, courts have construed it to bar competitor claims. Accordingly, the exclusion bars TCI's claims against Peerless.

TCI's reliance on *Aragon-Haas* is misplaced. There, the plaintiff sued her employer for wrongful discharge, and the trial court sustained the employer's demurrer without leave to amend, concluding that the plaintiff was an "at-will" employee. (*Aragon-Haas, supra,* 231 Cal.App.3d at pp. 235–238.) The appellate court reversed, reasoning that the plaintiff's contract of employment—which had been incorporated into the complaint—was ambiguous on its face regarding the plaintiff's employment status. (*Id.* at pp. 236, 239–240.) As explained above, the policy contains no such ambiguity.

### F. Leave to Amend

We turn to whether the trial court properly sustained the demurrer without leave to amend. Because TCI has offered no amendments before the trial court or on appeal, we discern no abuse of discretion. As explained in *Rakestraw v. California Physicians' Service, supra,* 81 Cal.App.4th at page 44, "[t]he burden of showing that a reasonable possibility exists that amendment can cure the defects remains with the plaintiff; neither the trial court nor this court will rewrite a complaint. [Citation.] Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend. [Citations.]"

---

[4] TCI also purports to find support for its contention in *Standard Fire Ins. Co. v. Peoples Church of Fresno* (9th Cir. 1993) 985 F.2d 446, 450. However, this decision contains no discussion of the nonconformity exclusion.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

Willhite, Acting P. J., and Suzukawa, J., concurred.