[No. B215457. Second Dist., Div. Four. Jan. 27, 2010.]

STATE FARM GENERAL INSURANCE COMPANY, Plaintiff and Respondent, v.
JT'S FRAMES, INC., Defendant and Appellant.

## Counsel

Law Offices of Ryan G. Richardson, Ryan G. Richardson; Law Offices of Leah Nico and Phillip A. Bock for Defendant and Appellant.

Robie & Matthai, James R. Robie, Steven S. Fleischman and David J. Weinman for Plaintiff and Respondent.

## Opinion

**MANELLA, J.**—In an Illinois lawsuit, appellant JT's Frames, Inc. (JT's), obtained a settlement on behalf of itself and a class of similarly situated entities based on defendant's transmission of over 74,000 unsolicited faxes to class members. In the underlying lawsuit, respondent State Farm General Insurance Company (State Farm) sought a declaration that JT's claims were not covered as "advertising injury" or "property damage" under policies State Farm allegedly issued to the Illinois defendant. JT's moved to quash service of State Farm's complaint on the ground JT's was not subject to personal jurisdiction in California. The trial court denied the motion to quash, and JT's sought a writ in this court. While the writ petition was pending, the parties moved forward with the litigation, and the trial court granted summary judgment in favor of State Farm shortly before the writ was summarily denied.

JT's appeals both the judgment entered and the order denying its motion to quash. We conclude the order denying the motion to quash is not appealable where, as here, the party contesting jurisdiction enters a general appearance and litigates the merits. We further conclude that the claims asserted in the Illinois action were not covered by the State Farm policies. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Insurance Policies*

The essential facts are not disputed. In October 2002, State Farm, an Illinois corporation with its principal place of business in California, issued an insurance policy to "[t]he Friedman Group." Similar policies followed in 2003, 2004, 2005 and 2006. The final policy was in effect until April 2007.

The policies covered "advertising injury caused by an occurrence committed in the coverage territory during the policy period."[1] "[A]dvertising injury" was defined to include: "a. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; b. oral or written publication of material that violates a person's right of privacy; c. misappropriation of advertising ideas or style of doing business; or d. infringement of copyright, title or slogan."

The policies also covered "property damage caused by an occurrence." With respect to property damage, "occurrence" was defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions which result in bodily injury or property damage."

### B.. *The Prior Litigation*

During the period the policies were in effect, a company identifying itself as "[t]he Friedman Group" transmitted tens of thousands of unsolicited advertisements via facsimile machine or "fax" to a number of parties, including appellant JT's Frames, an Illinois corporation.[2] In April 2007, JT's filed a class action lawsuit against "[t]he Friedman Group International,"[3] alleging violation of the Telephone Consumer Protection Act of 1991 (47 U.S.C. § 227; TCPA).[4] JT's also alleged conversion and violation of the

---

[1] State Farm states in its brief that the initial policy contained an endorsement excluding "advertising injury." The impact of this alleged exclusion was not resolved by the trial court and we do not consider it here.

[2] The action of faxing numerous unsolicited faxes to potential customers is referred to as "fax blasting" or "blast faxing." (See *Gene & Gene LLC v. BioPay LLC* (5th Cir. 2008) 541 F.3d 318, 322, 326; *Flag Co. v. Maynard* (N.D.Ill. 2005) 376 F.Supp.2d 849, 851, fn. 3.)

[3] Because the parties dispute whether the Friedman Group International and the Friedman Group are the same entity, we will refer to the former as "defendant" or by its full name.

[4] The TCPA prohibits the "use [of] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." (47 U.S.C. § 227(b)(1)(C).) The recipient of an unsolicited fax advertisement may bring an action to recover the greater of his actual damages or "$500 in damages for each such violation."

Illinois Consumer Fraud and Deceptive Practices Act (815 Ill. Comp. Stat. Ann. 505/1 et seq.). Defendant tendered the defense to State Farm. State Farm denied coverage.

In February 2008, JT's entered into a settlement agreement with defendant in the amount of $19,520,000. In the settlement agreement, the parties stipulated to certification of a class defined as " '[a]ll persons to whom Defendant sent advertising faxes during the period of April 2, 2003 through January 30, 2007 without the recipients' prior express permission or invitation and with whom Defendant had not done business.' "[5] The settlement specified that the judgment would be enforceable only against the proceeds of defendant's insurance policies, and defendant assigned to the class its claims and rights under the State Farm policies.

### C. *Instant Litigation—Motion to Quash*

In July 2008, State Farm brought the instant action for declaratory relief against JT's, suing JT's in its capacity as class representative and as assignee of the Friedman Group International. The complaint contended, among other things, that State Farm owed no duty to defend the class action because the policies did not cover the claims alleged and because "[t]he Friedman Group International" was not the named insured.

JT's moved to quash for lack of personal jurisdiction and moved to dismiss on the ground of inconvenient forum. In support of its motion to quash, JT's submitted a declaration from its managing director and corporate secretary, stating that JT's was an Illinois corporation with its only place of business in Illinois and with no contacts with California. State Farm opposed, contending JT's status as an assignee of a California entity justified jurisdiction.[6]

On November 17, 2008, the court denied JT's motions.[7] On December 1, JT's filed a writ petition seeking review of the order denying the motion to

---

(47 U.S.C. § 227(b)(3); *Gene & Gene LLC v. BioPay LLC, supra*, 541 F.3d at p. 322.) The award may be trebled for willful violations. (47 U.S.C. § 227(b)(3); 541 F.3d at p. 322.)

[5] The settlement agreement was contingent on the Illinois court's certifying the class. In May 2008, the Illinois court certified the class and approved the settlement agreement. While the underlying case was pending, State Farm sought to vacate the Illinois judgment. The Illinois court denied the petition to vacate on procedural grounds, but stayed enforcement of the judgment pending State Farm's appeal of the denial of the motion to vacate. The Illinois appellate court reversed the denial and remanded the case to the trial court to resolve the merits.

[6] In line with its position that "[t]he Friedman Group International" was not the insured, State Farm contended that JT's assignor "alleged[ly] had its principal place of business in California."

[7] On appeal, JT's does not challenge the court's denial of its forum non conveniens motion.

dismiss for lack of personal jurisdiction. On February 4, 2009, State Farm filed a motion to dismiss JT's writ petition, contending JT's had made a general appearance by engaging in various activities (described further below) while the writ was pending. The motion was denied. By order dated February 27, 2009, this court summarily denied JT's petition for writ.

During the period the parties were awaiting resolution of the jurisdictional issue, they continued to press forward with the litigation in the trial court. While JT's motion to quash was pending, the parties filed case management statements. On November 20, State Farm submitted a motion seeking to have the court determine that California law governed the interpretation of the insurance policies. On December 4, the parties signed a stipulation stating their intention to file cross-motions for summary judgment or summary adjudication by January 2009. On December 8, JT's promulgated discovery requests. On December 15, JT's opposed State Farm's choice of law motion.[8] On January 14, State Farm moved for summary judgment. On January 28, JT's filed its opposition. The motion for summary judgment was granted on February 11, while the writ seeking review of the order denying JT's motion to quash was pending.

### D. *Motion for Summary Judgment*

In its January 2009 motion for summary judgment, State Farm contended that the fax blasting claims did not fall under the policies' "advertising injury" or "property damage" coverage.[9] JT's opposed, contending coverage was available under the provision defining advertising injury to include " 'oral or written publication of material that violates a person's right of privacy,' " and that the act of sending faxes could result in "property damage" within the meaning of the policies.

The trial court granted the motion. The court concluded that fax blasting was "not an invasion of privacy" under the policies' advertising injury coverage "in any ordinary or simple English usage." The court further concluded that there was no coverage for property damage because the action of sending tens of thousands of faxes over the course of many years was "no accident." Judgment was entered for State Farm. This appeal followed.

---

[8] The trial court ultimately determined that California law governed interpretation of the policies. No issue concerning the applicable law is raised on appeal.

[9] State Farm also sought summary judgment on the ground that "[t]he Friedman Group International" was not a named insured. The trial court did not resolve that issue and it is not raised on appeal.

## DISCUSSION

### A. *Personal Jurisdiction*

■ Pursuant to California's long-arm statute, California courts may exercise jurisdiction on any basis not inconsistent with the California or United States Constitutions. (Code Civ. Proc., § 410.10.) "A state court's assertion of personal jurisdiction over a nonresident defendant who has not been served with process within the state comports with the requirements of the due process clause of the federal Constitution if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 [58 Cal.Rptr.2d 899, 926 P.2d 1085], quoting *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 66 S.Ct. 154].)

JT's contends that it is not susceptible to suit in California and that the trial court erred in denying its motion to quash for lack of personal jurisdiction. We conclude the issue is not cognizable on appeal.

### 1. *Traditional Rule*

■ It has long been the rule in California that a defendant who chooses to litigate the merits of a lawsuit after its motion to quash has been denied has no right to raise the jurisdictional question on appeal. (*Jardine v. Superior Court* (1931) 213 Cal. 301, 304 [2 P.2d 756]; accord, *Remsberg v. Hackney Manufacturing Co.* (1917) 174 Cal. 799, 801 [164 P. 792]; *Olcese v. Justice's Court* (1909) 156 Cal. 82, 87 [103 P. 317].) It was said that by contesting the merits, " 'the defendant made a general appearance and submitted itself to the jurisdiction of the court' " and " 'thereby waived any right it may have had to insist that jurisdiction of its person had not been obtained.' " (*Jardine v. Superior Court, supra*, 213 Cal. at p. 304, quoting *Remsberg v. Hackney Manufacturing Co., supra*, 174 Cal. at p. 801.) As one court explained, to leave the door open for a later appeal of the jurisdictional issue after resolution of the merits would give the defendant an "unconscionable advantage": "[I]f the determination of the court [on the merits] be in his favor he may avail himself of it, while, if it be against him, he may fall back upon his plea of lack of jurisdiction of the person." (*Olcese v. Justice's Court, supra*, 156 Cal. at p. 87.)

As a result of this rule, a defendant who believed that a motion to quash for lack of personal jurisdiction had been wrongly decided by the trial court could either waive the lack of jurisdiction and litigate the merits, or submit to default on the merits and appeal the jurisdictional issue. (See *Jardine v.*

*Superior Court, supra*, 213 Cal. at p. 305.) Writ review was also available to challenge the denial of a motion to quash for lack of personal jurisdiction. (See, e.g., *ibid.*; *Proctor & Schwartz v. Superior Court* (1950) 99 Cal.App.2d 376, 383 [221 P.2d 972]; *Westinghouse Co. v. Justice's Court* (1926) 79 Cal.App. 759, 761 [250 P. 1104].) However, pursuing a writ did not extend the period for responding to the complaint. Thus, a defendant who objected to the court's assertion of jurisdiction risked having a default entered while litigating the issue through writ review. (See *Riskin v. Towers* (1944) 24 Cal.2d 274, 277–279 [148 P.2d 611]; Rep. of State Bar Com. on Administration of Justice (1954) 29 State Bar J. 224, 227 ["A grave[] situation . . . is created where the motion to quash is denied and the moving party believes that the trial court's ruling is erroneous. In such a situation he must decide, at his peril, whether to stand upon his motion or plead to the complaint. . . . If he stands on his motion, and the appellate court agrees with the lower court, he may have a large default judgment entered against him while litigating the jurisdictional issue."].) In 1954, the State Bar Committee on Administration of Justice recommended adding new provisions to the Code of Civil Procedure to ensure that a party seeking to contest jurisdiction did not face this dilemma. (Rep. of State Bar Com. on Administration of Justice, *supra*, 29 State Bar J., at pp. 227–228.)

### 2. *Statutory Provisions*

In 1955, the Legislature added the provisions recommended by the State Bar committee, former sections 416.1 through 416.3 of the Code of Civil Procedure, which clarified the procedures for attacking personal jurisdiction.[10] (See Stats. 1955, ch. 1452, §§ 1–3, pp. 2639–2640; *Hartford v. Superior Court* (1956) 47 Cal.2d 447, 451 [304 P.2d 1].) Former section 416.1 extended the time within which a defendant who moved to quash was required to respond to the complaint, giving the defendant until after service of an order denying the motion. (Stats. 1955, ch. 1452, § 1, p. 2639.) Former section 416.3 codified the availability of writ review by way of petition for mandate and gave a defendant who sought a writ additional time to plead, precluding entry of default while the writ petition was pending.[11] (Stats. 1955, ch. 1452, § 3, p. 2640.)

This addition to the statutory rules of procedure did not change the rule concerning the nonavailability of appellate review. In *McCorkle v. City of Los*

---

[10] Unless otherwise specified, statutory references are to the Code of Civil Procedure.

[11] Former section 416.3 provided that after denial of a motion to quash, the defendant "may . . . petition an appropriate appellate court for a writ of mandate . . . requiring the entry of [an] order quashing the service of summons" and that "no default may be entered against him, for a period of 10 days following written notice of the final judgment in the mandamus proceeding . . . ." (Stats. 1955, ch. 1452, § 3, p. 2640.)

*Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453], the Supreme Court explained that "[s]ection 416.3 was intended to . . . permit[] the moving party to defer a general appearance while pursuing the interlocutory appellate remedy [citations] . . . ." (*Id.* at pp. 257–258.) Citing "authoritative sources published both before and after the enactment of section 416.3," the Supreme Court stated that the Legislature clearly intended "that the section would provide [a] method of obtaining appellate review of [an order denying a motion to quash]" and that "the availability of the interlocutory appellate remedy . . . preclude[d] review of the order upon appeal from a judgment entered after trial on the merits."[12] (*McCorkle*, at p. 257.) The defendant in *McCorkle*, having answered the complaint and submitted to trial on the merits "waived its jurisdictional objection, and therefore[, could not] assert the objection on . . . appeal." (*Id.* at p. 258; see also *Fink v. Shemtov* (2010) 180 Cal.App.4th 1160, 1173 [103 Cal.Rptr.3d 509] [including in list of orders for which appellate review may be obtained only through writ petition "an order denying a motion to quash service of process based on a lack of personal jurisdiction"]; *Guedalia v. Superior Court* (1989) 211 Cal.App.3d 1156, 1160, fn. 2 [260 Cal.Rptr. 99] [Addition of former § 416.3 (now § 418.10) "rendered mandamus the *exclusive* remedy for a party who wished to assert his jurisdictional objection while nevertheless preserving his right to defend on the merits if his challenge was unsuccessful."]; *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 122–123 [40 Cal.Rptr.2d 839, 893 P.2d 1160] (conc. opn. of George, J.) ["[A] defendant in a civil case may challenge only by extraordinary writ a trial court order refusing to quash service, and may not raise the issue on direct appeal from a judgment entered after trial on the merits."].)

In 1969, sections 416.1 through 416.3 were repealed and their essential provisions transferred to current section 418.10. (See Stats. 1969, ch. 1610, §§ 18, 19, 20, p. 3373.) Subdivisions (b) and (c) of section 418.10 continue to provide that a party whose motion to quash has been denied may seek relief through a petition for writ of mandate and continue to specify that the time to respond to the complaint does not expire while the motion to quash and the writ are pending. (§ 418.10, subds. (b), (c).)

---

[12] The 1954 report of the State Bar Committee on Administration of Justice—one of the "authoritative sources" cited by the Supreme Court in *McCorkle*—stated: "Several approaches to the problem of appellate review of an order denying a motion to quash were considered. The majority of the Committee came to the conclusion that permitting a review by writ was preferable to permitting such review after a trial on the merits, which may consume a great deal of the court's time and be very expensive to both parties." (Rep. of State Bar Com. on Administration of Justice, *supra*, 29 State Bar J., at p. 227.)

### 3. *2002 Amendment*

■ In 2002, the Legislature added subdivision (e) to section 418.10. (See Stats. 2002, ch. 69, § 1.) Under subdivision (e), a defendant may move to quash and "simultaneously answer, demur, or move to strike the complaint or cross-complaint" and "no act" by a party who first makes a motion to quash, "including filing an answer, demurrer, or motion to strike," constitutes an appearance "unless the court denies the motion." (§ 418.10, subd. (e)(1).) If the court denies the motion, the defendant is deemed to have generally appeared on "entry of the order denying the motion." (*Ibid.*) If the party whose motion to quash is denied files a timely petition for writ of mandate, "the defendant or cross-defendant is not deemed to have generally appeared until the proceedings on the writ petition have finally concluded." (§ 418.10, subd. (e)(2).)

JT's contends that section 418.10, subdivision (e) permits parties to seek postjudgment appellate review of an order denying a motion to quash under the circumstances presented here. Noting that the order denying the petition for writ of mandate was filed *after* the order granting summary judgment, JT's asserts that because it "scrupulously followed Code of Civ. Proc. § 418.10" it "never generally appeared before the Superior Court" and, therefore, "never waived its right to object to personal jurisdiction." In JT's view, as long as writ review of the order denying a motion to quash is pending at the time of final resolution of the case, a defendant who initially contests jurisdiction and thereafter fully litigates the merits of the case has never made a general appearance and therefore never waived the alleged jurisdictional defect for purposes of seeking appellate review.

JT's misinterprets the impact of section 418.10, subdivision (e). Prior to its existence, practice under section 418.10, was accurately described as " 'a quagmire filled with traps for the unwary.' " (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1325 (2001–2002 Reg. Sess.) Apr. 9, 2002, p. 3, quoting State Bar Conf. of Delegates.) Whatever the merits of a defendant's jurisdictional contest, courts held that the defendant had made a general appearance and waived the jurisdictional issue if he or his counsel answered the complaint, even where the answer included a disclaimer of jurisdiction (*Terzich v. Medak* (1978) 78 Cal.App.3d 636, 639 [144 Cal.Rptr. 323]); entered into a stipulation extending time to answer, demur or otherwise plead (*General Ins. Co. v. Superior Court* (1975) 15 Cal.3d 449, 453–454 [124 Cal.Rptr. 745, 541 P.2d 289]); stipulated to continue a hearing (*Kriebel v. City Council* (1980) 112 Cal.App.3d 693, 700 [169 Cal.Rptr. 342]); prepared a joint case management statement and participated in an evaluation conference before the trial court (*Mansour v. Superior Court* (1995) 38 Cal.App.4th 1750, 1757–1758 [46 Cal.Rptr.2d 191]); or appeared at a hearing on a temporary

restraining order and gave reasons why it should be denied (*California Overseas Bank v. French American Banking Corp.* (1984) 154 Cal.App.3d 179, 184–185 [201 Cal.Rptr. 400]).

■ The Legislature added subdivision (e) to section 418.10 in order to "simplify procedures and reduce the risk of an inadvertent submission to jurisdiction." (*Roy v. Superior Court* (2005) 127 Cal.App.4th 337, 342 [25 Cal.Rptr.3d 488]; see Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1325 (2001–2002 Reg. Sess.) Apr. 2, 2002, p. 4.) Subdivision (e) prevents the inadvertent waiver of objections to jurisdiction by delaying recognition of the party's general participation in the litigation until after the jurisdictional issue is finally resolved. A party may answer, demur, move to strike and perform other actions related to the merits without fear of accidentally waiving a potentially meritorious attack on personal jurisdiction. However, subdivision (e) does not change the essential rule that "[a] defendant submits to the court's jurisdiction by making a general appearance in an action" by "partici-pat[ing] in the action in a manner which recognizes the court's jurisdiction." (*Factor Health Management v. Superior Court* (2005) 132 Cal.App.4th 246, 250 [33 Cal.Rptr.3d 599]; accord, *Roy v. Superior Court, supra,* 127 Cal.App.4th at p. 341.) It merely delays the effect of such actions until the motion to quash is denied or, if the defendant seeks writ review, until proceedings on the writ have concluded. Once the motion is denied or writ proceedings have concluded, the actions undertaken by the defendant while the motion or writ was pending that recognized the trial court's jurisdiction will be "deemed" to constitute a general appearance, and no further objection to jurisdiction will be permitted. JT's, having participated fully in resolving the merits of the litigation while the writ was pending, submitted itself to the jurisdiction of the court and waived any further right to contest personal jurisdiction.[13]

We acknowledge that the Legislature stated in enacting the 2002 amend-ments that "[i]t is the intent of the Legislature in enacting this act to conform California practice with respect to challenging personal jurisdiction to the

---

[13] Under the language of the first sentence of section 418.10, subdivision (e)(1), the "safe harbor" granted by the first part of the sentence ("no act by a party who makes a motion [challenging personal jurisdiction] . . . constitutes an appearance") is qualified by the second part ("unless the court denies the motion . . ."). Had the Legislature intended the interpretation JT's suggests, it could have drafted the statute to provide that "[N]o act by a party who makes a motion [challenging personal jurisdiction] . . . constitutes an appearance," *provided the party seeks writ review of the denial of such motion.* By using the word "unless," the Legislature expressly provided that any freedom from the usual consequences of conduct constituting a general appearance was temporary and conditional. Subdivision (e)(2) confirms that recogni-tion of a defendant's general appearance is triggered by the denial of the motion challenging jurisdiction, but ensures a defendant the opportunity to seek writ review by providing that such defendant will not be "deemed to have generally appeared until the proceedings on the writ petition have finally concluded."

practice under Rule 12(b) of the Federal Rules of Civil Procedure." (Stats. 2002, ch. 69, § 2.) Rule 12(b) permits the defense of lack of personal jurisdiction to be raised in the answer. (Fed. Rules Civ.Proc., rule 12(b)(2) (28 U.S.C.).) In addition, under federal procedures, personal jurisdiction may be litigated long after litigation of the merits has commenced, and the defendant may appeal jurisdictional issues after the case is resolved. (See, e.g., *Brownlow v. Aman* (10th Cir. 1984) 740 F.2d 1476, 1483, fn. 1; *Boit v. Gar-Tec Products, Inc.* (1st Cir. 1992) 967 F.2d 671, 677–678.) As we explain, however, our review of section 418.10, subdivision (e) and its legislative history convinces us that the Legislature intended to conform California law to federal procedures only with respect to preliminary objections to a complaint, not in other areas.

■ Three factors inform our decision. First, the Legislature made no reference to the right of appeal and changed none of the provisions governing writ review. We do not believe the Legislature intended to overturn, sub silentio, over a century of California procedural law precluding appeal of orders denying motions to quash once the defendant makes a general appearance. (See *Gaetani v. Goss-Golden West Sheet Metal Profit Sharing Plan* (2000) 84 Cal.App.4th 1118, 1127 [101 Cal.Rptr.2d 432] [in interpreting statutes, courts presume "the Legislature is aware of appellate court decisions" and do not presume that "the Legislature, in the enactment of statutes, intends to overthrow long-established principles of law unless such an intention is made clear by declaration or necessary implication"]; *Estate of McDill* (1975) 14 Cal.3d 831, 837–838 [122 Cal.Rptr. 754, 537 P.2d 874] [" 'The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended.' [Citations.]"].)

Second, the Legislature included the term "generally appeared" in the language of section 418.10, subdivision (e), continuing the distinction between special and general appearances, which federal courts have not recognized for some time. (See, e.g., *SEC v. Wencke* (9th Cir. 1986) 783 F.2d 829, 832, fn. 3 ["Federal Rule of Civil Procedure 12 abolished the distinction between general and special appearances when the Federal Rules were adopted in 1938."].) By retaining this distinction and fixing the point at which a defendant who litigates the merits will be deemed to have "generally appeared"—either on entry of the order denying the motion to quash or when the proceedings on the writ petition have finally concluded—the Legislature made clear that subdivision (e) does not implement the federal procedure under which the defendant can, by raising an objection to personal jurisdiction at an early stage, avoid waiving the jurisdictional issue through the end of the litigation. (See *SEC v. Wencke, supra*, 783 F.2d at pp. 832–833, fn. 3 [noting that the abolition of the distinction between special and general

appearances permits defendants in federal court to raise arguments on the merits of the action without sacrificing the right to challenge the court's jurisdiction at a later time].)

Third, the Assembly Committee on the Judiciary, in explaining how the 2002 amendment would "conform California procedure to federal procedure," discussed only preliminary objections to the complaint. Its report stated: "Since [1937], federal rule 12(b) has provided that the defenses of lack of jurisdiction over the person, insufficiency of process, or insufficiency of service of process may be made by motion in conjunction with a motion to dismiss for lack of subject-matter jurisdiction, the federal equivalent of the California's demurrer. This procedure allows consolidation of these preliminary objections in a single motion, avoiding confusion and inadvertent error, as well as the expense, burden and delay of successive filings." (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1325 (2001–2002 Reg. Sess.) as amended Apr. 9, 2002, pp. 3–4.) "Statements of legislative committees pertaining to the purpose of legislation are presumed to express the legislative intent of statutes as enacted," (*Altaville Drug Store, Inc. v. Employment Development Department* (1988) 44 Cal.3d 231, 238 [242 Cal.Rptr. 732, 746 P.2d 871].) The statements of the Assembly Committee on the Judiciary attest to the intent of the Legislature to bring California procedure in line with federal procedure only to the extent that litigation of the merits is permitted during the "preliminary objection" stage of the litigation.

Our conclusion respecting the limited nature of the 2002 amendment is supported by *Roy v. Superior Court*, where the defendants filed an answer raising the alleged lack of personal jurisdiction as an affirmative defense rather than immediately moving to quash. Thereafter, the defendants actively participated in the litigation, propounding discovery, filing motions to compel and filing a motion for summary judgment, finally moving to quash just before the summary judgment motion was scheduled to be heard. The trial court concluded that the defendants' objection to jurisdiction had been waived. In a subsequent writ proceeding, the defendants contended that they followed proper procedure and that the Legislature intended by the 2002 amendment to preserve jurisdictional objections for later determination. Addressing the "extent [to which] California practice [has] been conformed to federal," the court concluded that the Legislature did not intend to "establish[] an entire set of new procedures sub silentio" or to "implied[ly] invalidat[e] literally decades of established practice." (*Roy v. Superior Court, supra*, 127 Cal.App.4th at pp. 342, 344.) Moreover, the court saw no advantage in adopting the federal practices as a whole, practices which would permit defendants to " 'bur[y]' " their jurisdictional challenges in the middle of "boilerplate 'defenses' " and to then "vigorously, and no doubt expensively" litigate the action. (*Id.* at p. 343.) By requiring that the issue of

jurisdiction be raised and resolved at an early stage, "California's historical approach serves the interests of all parties and of the courts." (*Ibid.*)

We find the reasoning of the court in *Roy* persuasive. If the Legislature intended attacks on jurisdiction in California to track federal procedure in all respects, it would have adopted far more extensive revisions to the Code of Civil Procedure and particularly to section 418.10. The Legislature could not have intended to "implied[ly] invalidat[e] . . . literally decades of established practice" sub silentio. (*Roy v. Superior Court, supra*, 127 Cal.App.4th at p. 344.) The addition of section 418.10, subdivision (e) permits litigation of personal jurisdiction to be combined with other issues that may dispose of the case at an early stage. Under the procedures set forth in section 418.10, JT's could have demurred or moved to strike State Farm's complaint, which would have been deemed a general appearance after the jurisdictional issue was finally resolved. But it was not obligated to undertake *any* action that would constitute a general appearance until after its writ was resolved, as its time for pleading would not have expired until 10 days after written notice of the final judgment in the mandate proceeding. (§ 418.10, subd. (c).) JT's freely chose to involve itself in the merits of the action, and even stipulated to have the court decide the summary judgment motion before the time prescribed by statute. (See § 437c, subd. (a) [motion for summary judgment cannot be made until "60 days have elapsed since the general appearance in the action or proceeding of each party against whom the motion is directed."].) JT's cannot now be surprised that its jurisdictional objections are deemed waived.

### B. *Advertising Injury*

We now turn to the merits. JT's contends the trial court erred in interpreting the insurance policy provision at issue. JT's maintains that the provision defining advertising injury as "oral or written publication of material that violates a person's right of privacy" is broad enough to cover fax blasting. We disagree.

#### 1. *Rules of Construction*

It has been said that in interpreting insurance policies, "doubts as to meaning must be resolved against the insurer." (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].) The Supreme Court has made clear, however, that an abstract ambiguity based on a semantically permissible interpretation of a word or phrase cannot create coverage where none would otherwise exist. "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.

[Citation.] If contractual language is clear and explicit, it governs. [Citation.] On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] . . . Only if this rule does not resolve the ambiguity do we then resolve it against the insurer." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545], quoting Civ. Code, § 1649.) "[A] court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " (*Bank of the West v. Superior Court, supra*, at p. 1265, italics omitted, quoting *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920].)

### 2. *Right of Privacy: Secrecy Versus Seclusion*

The language of the provision at issue states that advertising injury includes "oral or written publication of material that violates a person's right of privacy." "[R]ight of privacy" is commonly understood to mean the right to keep personal information confidential or secret. It may also refer to the right to seclusion or to be free from unwanted intrusions. (See *American States Ins. Co. v. Capital Associates Jackson Co.* (7th Cir. 2004) 392 F.3d 939, 941 (*American States*) ["A person who wants to conceal a criminal conviction, bankruptcy, or love affair from friends or business relations asserts a claim to privacy in the sense of secrecy. A person who wants to stop solicitors from ringing his doorbell and peddling vacuum cleaners at 9 p.m. asserts a claim to privacy in the sense of seclusion."]; *ACS Systems, Inc. v. St. Paul Fire & Marine Ins. Co.* (2007) 147 Cal.App.4th 137, 148–149 [53 Cal.Rptr.3d 786] (*ACS Systems*) ["[A] person claiming the privacy right of seclusion asserts the right to be free, in a particular location, from disturbance by others. A person claiming the privacy right of secrecy asserts the right to prevent disclosure of personal information to others." (Italics omitted.)].) "Invasion of the privacy right of seclusion involves the means, manner, and method of communication in a location (or at a time) which disturbs the recipient's seclusion. By contrast, invasion of the privacy right of secrecy involves the content of communication that occurs when someone's private, personal information is disclosed to a third person." (*ACS Systems, supra*, at p. 149, italics omitted.)

JT's claims in the Illinois action involved violation of the TCPA, which protects the right to seclusion.[14] The policies' advertising injury provision can cover the claims asserted by JT's in the Illinois action only if the "right of privacy" referred to includes the right to seclusion. State Farm maintains that the only right of privacy to which the policy refers is the right to be free from disclosure of personal or confidential information.

### 3. *Last Antecedent Rule*

 Applying the applicable rules of construction, we agree with the trial court and State Farm that the claims settled by JT's were not covered by the advertising injury provisions of the policies. The trial court's interpretation is in line with the plain language of the allegedly applicable provision under the " 'last antecedent rule,' " which provides that " ' " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' " ' " (*ACS Systems, Inc., supra*, 147 Cal.App.4th at p. 150, quoting *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 [110 Cal.Rptr.2d 828, 28 P.3d 876].) Applying this rule, the phrase "that violates a person's right to privacy" must be construed to modify the word "material." In other words, to come within the policies' definition of advertising injury, the *material* at issue must "violate[] a person's right to privacy," which would be the case only if the material contained confidential information and violated the victim's right to secrecy.[15]

In *ACS Systems*, Division Three of this district applied the last antecedent rule to interpret a similar policy provision—one defining advertising injury to include " 'making known to any person or organization written or spoken material that violates an individual's right of privacy.' " (*ACS Systems, supra*, 147 Cal.App.4th at p. 149.) The court concluded that the coverage applied only to "liability for injury caused by the disclosure of private content to a third party—to the invasion of 'secrecy privacy' caused by 'making known'

---

[14] See *Bonime v. Avaya, Inc.* (2d Cir. 2008) 547 F.3d 497, 499, quoting S.Rep. No. 102-178, page 1 (1991) ("Congress's stated purpose in enacting the TCPA was to 'protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers.' "); *American States, supra*, 392 F.3d at page 942 ("[A]n unexpected fax, like a jangling telephone or a knock on the door, can disrupt a householder's peace and quiet . . . . [The TCPA] doubtless promotes this (slight) interest in seclusion . . . .").

[15] We reject JT's claim that because the TCPA targets faxes "advertising the commercial availability or quality of any property, goods, or services" (47 U.S.C. § 227(a)(5)), it was the content of the faxes that violated the recipient's right of privacy. While the fact that the faxes contained advertising was relevant to demonstrating a TCPA claim, any privacy interest in being free from an unwelcomed fax is unaffected by the content of the material.

to a third party 'material that violates an individual's right of privacy.' " (*Id.* at p. 150, italics deleted.) The court held that the coverage did not apply to injury caused by receipt of an unauthorized advertising fax, because "in that case no disclosure of private facts to a third party has occurred: The recipient of an unauthorized advertising fax has no claim that 'material that violates an individual's right of privacy' has been 'made known' to a third party." (*Ibid.*)

JT's notes that the language of the policy at issue in *ACS Systems* differed from the language at issue here. In *ACS Systems*, the provision defined advertising injury to include " 'making known to any person or organization written or spoken material that violates an individual's right of privacy' " (*ACS Systems, supra,* 147 Cal.App.4th at p. 149), whereas State Farm's policies define it as "oral or written publication of material that violates a person's right of privacy."[16] The distinction lies chiefly in the use of the word "publication" rather than the phrase "making known to any person or organization." We find it to be one without a difference. "[P]ublication" is defined as "mak[ing] known." (*Reimel v. Alcoholic Bev. etc. Appeals Bd.* (1967) 256 Cal.App.2d 158, 166–167 [64 Cal.Rptr. 26], quoting Black's Law Dict. (4th ed. 1954).) Moreover, as one court has noted: "In a secrecy situation, publication matters; . . . [i]n a seclusion situation, publication is irrelevant [because a] late-night knock on the door or other interruption can impinge on seclusion without any need for publication." (*American States, supra,* 392 F.3d at p. 942.) As the distinction noted by JT's consists of a word substituted for a synonymous phrase, we decline to find the existence of insurance coverage depends on any marginal semantic difference.

### 4. *Context*

Even were we not persuaded by the last antecedent rule and the decision in *ACS Systems* interpreting similar language, the rules of construction also require that a court read the provisions of a policy in context before reaching the conclusion that a provision is ambiguous. Looking at the relevant definition of advertising injury in context persuades us that advertising injury coverage applies only to content-based claims.

---

[16] As JT's also points out, several courts have interpreted the language at issue here to cover fax blasting claims. (See, e.g., *Motorists Mutual Ins. Co. v. Dandy-Jim, Inc.* (2009) 182 Ohio App.3d 311 [2009 Ohio 2270, 912 N.E.2d 659]; *Terra Nova Ins. Co. v. Fray-Witzer* (2007) 449 Mass. 406 [869 N.E.2d 565]; *Valley Forge Ins. Co. v. Swiderski Electronics, Inc.* (2006) 223 Ill.2d 352 [307 Ill.Dec. 653, 860 N.E.2d 307]; *TIG Ins. Co. v. Dallas Basketball, Ltd.* (Tex.App. 2004) 129 S.W.3d 232, abrogated in part on another ground in *Lamar Homes, Inc. v. Mid-Continent Casualty Co.* (Tex. 2007) 242 S.W.3d 1.) Other courts have said the language does not cover the offense. (See, e.g., *American States, supra,* 392 F.3d 939; *Auto-Owners Ins. Co. v. Websolv Computing, Inc.* (7th Cir. 2009) 580 F.3d 543 (*Auto-Owners*); *Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co.* (N.D.Ill. 2008) 580 F.Supp.2d 678; *St. Paul Fire & Marine Ins. Co. v. Brunswick Corp.* (N.D.Ill. 2005) 405 F.Supp.2d 890.)

The provision at issue falls in the middle of four definitions of "advertising injury": (1) "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services"; (2) *"oral or written publication of material that violates a person's right of privacy"*; (3) "misappropriation of advertising ideas or style of doing business"; or (4) "infringement of copyright, title or slogan." Definitions (1), (3) and (4) all involve injury caused by the information contained in the advertisement. In each of these cases, the victim is injured by the content of the advertisement, not its mere sending and receipt. Viewed in this context, definition 3 may most reasonably be interpreted as referring to advertising material whose *content* violates a person's right of privacy.

In *American States, supra,* 392 F.3d 939 and *Auto-Owners, supra,* 580 F.3d 543, the Seventh Circuit, construing the same language at issue here in context with the policies' coverage of advertising injury as a whole, concluded that fax blasting was not covered. The policies at issue in *American States* and *Auto-Owners* contained the same four definitions of advertising injury as are found in State Farm's policies. Noting that "[t]he other three provisions of the advertising-injury definition focus on harm arising from the content of an advertisement rather than harm arising from mere receipt of an advertisement" (italics omitted) and "require the examination of the content of the offending advertisement," the Seventh Circuit concluded: "It is therefore reasonable to infer that [the second definition of advertising injury] also concerns harm emanating from the content of an advertisement; that is, it is reasonable to read [the second definition] to refer only to violations of secrecy interests." (*Auto-Owners, supra,* 580 F.3d at p. 551; accord, *American States, supra,* 392 F.3d at p. 943 [structure of policy indicated that "advertising-injury coverage deals with informational content"].)

In *ACS Systems,* 147 Cal.App.4th 137, the court likewise found that the policy's definitions of advertising injury "provide a context that clarifie[d] the meaning of the provision at issue" and undertook a similar analysis: "As stated, the St. Paul policy defines four 'advertising injury offenses.' The first, 'libel or slander,' involves a publication of defamatory content about someone to a third person. [Citations.] The second, '[m]aking known to any person or organization written or spoken material that belittles the products, work or completed work of others,' likewise involves a publication to a third person of content that belittles someone's products, work or completed work. The fourth advertising injury offense involves the unauthorized taking or use of content—of someone else's 'advertising idea, material, slogan, style or title.' These three advertising injury offenses therefore all involve the insured's making known or unauthorized taking or use of *content* which injures someone." (147 Cal.App.4th at p. 151.) It followed that construing the provision " '[m]aking known to any person or organization written or spoken

material that violates an individual's right of privacy' " in context led to the conclusion that "[t]he covered advertising injury offense involves communication or making known of written or spoken material whose content injures someone else." (*Ibid.*; accord, *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.* (4th Cir. 2005) 407 F.3d 631, 641 ["[The four definitions of advertising injury] all share the common thread of assuming that the victim of the advertising injury offense is harmed by the sharing of the *content* of the ad, not the mere *receipt* of the advertisement."]; *Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.* (E.D.Pa. 2006) 432 F.Supp.2d 488, 502 ["The offenses enumerated in [the policy's advertising injury] provision clearly relate to the content of the covered material. [Citation.] Defamation, disparagement and misappropriating all focus on the message contained in the covered material. All of these offenses address the message conveyed rather than the method of conveyance."].)

In sum, we are persuaded that the interpretation of the policy provision at issue, when read under the applicable rules of construction, does not cover the claims asserted by JT's against defendant in the Illinois lawsuit.

### C. *Property Damage*

Finally, we address JT's contention that fax blasting was covered by the policies' property damage provision. The State Farm policies covered "property damage caused by an occurrence," with "occurrence" defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions which result in bodily injury or property damage." State Farm does not dispute that a fax blaster's unauthorized use of the injured parties' fax machines and toner could constitute "property damage." (See *Destination Ventures v. Federal Communications Com.* (9th Cir. 1995) 46 F.3d 54, 57 [finding that "unsolicited fax advertisements shift significant advertising costs to consumers" based on cost of paper and use of victims' fax machines]; *American States, supra,* 392 F.3d at p. 942 [TCPA "keeps telephone lines from being tied up and avoids consumption of the recipients' ink and paper"].) The issue is whether the damage was caused by an "accident."

The issue of coverage under a property damage provision was resolved in *ACS Systems,* where the policy covered property damage caused by "an 'event' " and event was defined as " 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.' " (*ACS Systems, supra,* 147 Cal.App.4th at p. 154.) The court

concluded that the damage caused by the fax transmissions was not the result of an accident because "[a]n 'accident' requires unintentional acts or conduct," whereas the insured "intended the fax transmissions to occur." (*Id.* at p. 155; accord, *Terra Nova Ins. Co. v. Fray-Witzer, supra,* 869 N.E.2d at p. 571 [in determining whether injuries arising from unsolicited fax advertisement were "accidents," court stated: "Any sender of a facsimile advertisement knows that his recipient will be forced to consume paper and toner, and will lose temporarily the use of the facsimile transmission line."]; see *Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 311–312 [97 Cal.Rptr.3d 298, 211 P.3d 1083] ["[A]n injury-producing event is not an 'accident' within the policy's coverage language when all of the acts, the manner in which they were done, and the objective accomplished occurred as intended by the actor."]; *American States, supra,* 392 F.3d at p. 943 ["Senders may be uncertain whether particular faxes violate [the TCPA] but all senders know exactly how faxes deplete recipients' consumables. . . . Because *every* junk fax invades the recipient's property interest in consumables, this normal outcome is not covered."].) We agree with these authorities and with the conclusion of the trial court. The fax blasting at issue in the Illinois litigation was no accident.

JT's acknowledges this authority but contends we should follow *Park University Enterprises, Inc. v. American Casualty Co.* (10th Cir. 2006) 442 F.3d 1239, 1245, in which the court held that a transmitter of a fax who believes he is transmitting to a recipient who wishes to receive it, does not intentionally injure the recipient. We decline to do so. The focus is not on whether the transmitter intended to violate the TCPA or any recognized right of the recipient, but on whether the transmitter intentionally sent the fax. Moreover, in opposing State Farm's motion for summary judgment, JT's presented no evidence that the defendant in the Illinois litigation believed that its tens of thousands of faxed transmissions were solicited.[17] In the absence of evidence to suggest that the transmissions were the result of a mistake concerning the desires of the recipients of the faxes, there was no basis to consider whether to apply the rule applied in *Park University*.

Our holding establishes that State Farm had no duty to defend or indemnify defendant with whom JT's entered into a settlement. Although the policies issued by State Farm included coverage for "advertising injury" and "property damage," fax blasting is not publication of "material that violates a person's right of privacy." Nor is the transmission of such faxes an "accident" that causes property damage. Accordingly, the summary judgment is affirmed.

---

[17] We note that JT's complaint described the transmissions as "unsolicited facsimile advertisements" that defendant "did not have permission or invitation to send."

## DISPOSITION

The judgment is affirmed. State Farm shall recover its costs on appeal.

Willhite, Acting P. J., and Suzukawa, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 28, 2010, S180357.